Robert CHAPPEL, Plaintiff–Appellee,

v.

MONTGOMERY COUNTY FIRE PROTECTION DISTRICT NO. 1; Montgomery County Ambulance District, Defendants,

Wayne Welch; Roger Minnich; Wendell Walters; George Updike; Philip Welch; John T. Lane; Shoen McCormick; Stanley Schwartz; Thomas C. Thornberry; Dr. Gregory Jones, in their individual capacities, Defendants–Appellants.

No. 96–5328.

United States Court of Appeals, Sixth Circuit.

Argued April 22, 1997.

Decided Nov. 14, 1997.

---

Sun S. Choy (argued and briefed), James M. Burd and R. Allen Button (briefed), Williams & Wagoner, Louisville, KY, for Defendants–Appellants.

Debra Ann Doss (argued and briefed), Lexington, KY, Elizabeth J. Turley (briefed), Jackson & Watts, Versailles, KY, for Plaintiff–Appellee.

Before: MERRITT, RYAN, and HILL,[*] Circuit Judges.

RYAN, Circuit Judge.

Robert Chappel filed a complaint alleging, in part, pursuant to 42 U.S.C. § 1983, that the defendants violated the First Amendment by taking various retaliatory actions against him after he criticized the defendants for mismanagement, corruption, and unethical behavior. The defendants filed a joint motion for summary judgment on the merits or, in the alternative, on the basis of qualified immunity. The district court denied the defendants' motion, and the defendants filed the present interlocutory appeal seeking reversal of the district court's judgment on the issue of qualified immunity. We now affirm the denial of qualified immunity.

## I.

### A.

Regrettably, in order to explain adequately our reasoning with regard to the multiple issues raised in this appeal, we must burden the opinion with an extensive recitation of the relevant facts. We beg the reader's indulgence.

In 1983, Chappel was hired as a part-time emergency medical technician (EMT) by the Montgomery County Fire Protection District No. 1. At that time, the fire district provided basic life support (BLS) and ambulance services for the Montgomery County Ambulance District. By 1987, Chappel had assumed firefighting duties, and was employed by the fire district as a full-time EMT/firefighter. Like other EMT/firefighters, Chappel worked shifts at both the central fire station and a smaller station on East Main Street. Although the central station is equipped to provide both firefighting and EMT-ambulance services, the East Main station provides only firefighting services.

In 1990, acting on his own initiative, Chappel began a two-year paramedic training program at the University of Kentucky. He was certified as a paramedic in November 1992. At that time, neither the fire district nor the ambulance district provided the community with the advanced life support (ALS) services for which paramedics are trained. Over the course of the next few years, Chappel held several part-time positions as an "on-call" paramedic with employers other than the fire and ambulance districts.

Defendant Wayne Welch began working for the fire district in 1969. He became fire chief in 1971. Welch also served on the fire district's board of trustees from 1979 to November 1992. For the last seven years of this period, Welch was chairman of the fire board. In 1982, Welch was hired by the ambulance district's board of trustees to assume additional duties as the director of ambulance services.

### B.

In October 1991, a Montgomery County newspaper, the *Mt. Sterling Advocate*, reported that the ambulance district would "upgrade" from EMT/BLS to paramedic/ALS service. In June 1992, the ambulance district received an $11,506 grant from the state to begin the paramedic program.

Chappel was, by his own admission, very interested in seeing the paramedic program implemented. In addition to recognizing that an upgrade to paramedic service would help save lives, Chappel explained that he would prefer not to have to work outside of

[*] The Honorable James C. Hill, Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

the fire or ambulance districts in order to maintain his license as a paramedic.

In an affidavit submitted to the district court, Chappel explains that he began to believe, in early 1992, that there were serious problems with the finances and management of the fire and ambulance districts, which would jeopardize the implementation of the paramedic program. Specifically, though not exclusively, Chappel was concerned that the ambulance district was not collecting billings; district funds were being misappropriated; training and standard operating procedures (SOPs) for employees of the fire district were inadequate; Welch was practicing nepotism; and Welch's position as both fire chief and chairman of the fire board created a conflict of interest.

Chappel claims that, in the summer of 1992, he began to raise some of these concerns with "several board members," the state auditor's office, and Montgomery County Judge Executive Bill Johnson. In particular, Chappel complained that the ambulance district's finances were suffering because Carma Welch, Welch's daughter and the ambulance district's office manager, was not adequately pursuing the collection of debts. Chappel adds that he asked the state auditor's office to investigate the "possible misappropriation of funds by the Welch family," and that he spoke to Johnson about the possibility of "unearned benefits being paid to the Welch family, falsified time sheets of Carma Welch and other possible misappropriations."

On August 4, 1992, the fire and ambulance boards held a public meeting at Johnson's direction. Chappel attended the meeting and took the opportunity to discuss publicly the importance of a paramedic service and to air some of his complaints. He criticized the ambulance district for failing to maintain adequate collection procedures and for failing to take steps to implement the paramedic program. Again Chappel placed much of the blame on Carma Welch. Chappel also complained about a lack of SOPs and adequate training for fire-district employees, and he criticized Welch for serving as both fire chief and chairman of the fire board.

Finally, Chappel complained about Welch's apparent nepotism. In this regard, Chappel was particularly upset because he believed that various members of the Welch family who were employed by the districts "weren't really doing their job." He complained not only about Carma Welch, but also about Welch's wife, Mary Welch, whom Chappel believed was receiving unearned benefits. Mary Welch served as the director of disaster and emergency services until January 1994. She was also apparently paid to keep the minutes at fire-board meetings for some ten years, although she was not a member of the board. James McCarty, Jr., a former member of the ambulance board, noted that Mary Welch also received some "remuneration" from the ambulance district during each of the seven years he was on the board, although he could not recall why she was being paid.

When Chappel arrived at work on August 5, 1992, he discovered that he had been assigned to the East Main station. The parties do not dispute that after that date Chappel remained assigned exclusively to the East Main station for a considerable length of time, and that Chappel was therefore unable to participate in regular ambulance runs which originated, at that time, from the central station.

On October 15, 1992, Chappel attended a meeting of the fire board and, according to his affidavit, he complained that

the Fire Department was paying insurance for Mary Bruce Welch, Carma Welch and Tammy Welch even though they were not employees of the Fire Department, Wayne Welch was allowed to write checks ... on his signature alone and without proper safeguards as to how the money was being spent, [the Welch family had] exclusive use ... of a VCR owned by the Fire Department, and [Carma Welch] falsifi[ed] ... time sheets.

Chappel explained that he also complained about "the need to adopt[ ] standard operating procedures ... [and the] inadequacies in training."

Chappel states that on October 22, 1992, he attended a meeting of the Montgomery County Fiscal Court "to discuss these same

concerns and [to] ... criticize[ ] the nepotism at the departments." Chappel states, and the parties do not dispute, that he continued to register similar complaints at fire and ambulance board meetings, and with individual members of the fire and ambulance boards, "up until the time of the filing of this action." An article in the *Advocate,* in June 1993, reported, for example, that Chappel had presented the ambulance board with "a petition signed by about 600 residents in favor of a paramedic program."

### C.

After much turmoil, the ambulance district eventually committed itself to the implementation of the paramedic program. Chappel and eight others applied for positions as paramedics. The three-member hiring committee consisted of Welch; Stanley Schwartz, a member of the ambulance board; and Dr. Gregory Jones, the newly hired medical director of the ambulance district's paramedic service.

Dr. Jones testified that, originally, he had not been interested in serving as director because there was a lot of public criticism of the ambulance district's finances, and he had not believed there was "political support in the community for" an upgrade to ALS service. Dr. Jones decided to accept the position in 1994, however, because "the [ambulance] board had been completely remade and [had] rededicated itself to straightening out some of those problems."

Because paramedics work under the license of the medical director, the hiring committee was apparently led by Dr. Jones. After an interview in June 1994, Chappel was initially offered a part-time or on-call position. However, on August 10, 1994, Dr. Jones sent a letter to Welch, in which he wrote:

Since [Chappel] is a Montgomery County resident I had hoped that we could help [him] gain maturity and learn to be a team member by employing him on a part time basis. However his recent unreasonable and disruptive actions demonstrate that he is not only unreliable but is a threat to the harmonious team atmosphere we are trying to establish.

In light of his past and current behavior I do not feel that I can permit Mr. Chappel to work under my medical license. Therefore I will not authorize Mr. Chappel to work as a paramedic with the Montgomery County Ambulance Service.

In his deposition, Dr. Jones explained that his decision not to hire Chappel was based on several instances during which Chappel had acted in an aggressive or inappropriate manner. Specifically, Dr. Jones testified that Chappel had pursued copies of the minutes from board meetings in a hostile manner, and that Schwartz had reported that Chappel had "pound[ed] on [a] table [while] demanding to know the exact date when [the Board] would upgrade to [ALS]." The final straw, according to Dr. Jones, was a confrontation in late July over his decision to not carry controlled substances in the district's ambulances. Dr. Jones testified that Chappel had been extremely "argumentative" and had "repeatedly questioned" his judgment.

### D.

The issues raised by Chappel and his activism in the community received a significant amount of coverage in the *Advocate* and a second Montgomery County newspaper, the *Herald–Leader.* In January 1992, the *Advocate* reported that "[i]rregularities were found at the Montgomery County Fire Department during an investigation by the state auditor's office and in the agency's annual audit." In particular, the article reported that "investigators ... found the ambulance service was sending original billings, but no evidence was found that bills were pursued after that." The article also noted that a 1991 audit reported that "checks requiring two signatures only contained one signature, that of Welch." Six months later, the *Advocate* reported that an $18,389 deficit in the ambulance district budget was attributable to "poor bookkeeping practices," a lack of "internal controls," and the "inability of the ambulance district to collect fees."

On August 6, 1992, the *Advocate* published an article concerning the August 4, 1992, meeting, under the heading, "County officials discuss financial plight of ambulance dis-

trict." Among other things, the article explained that Johnson and the fiscal court made several recommendations for improvement, including recommendations that "both the fire and ambulance boards hire independent accountants to handle their bookkeeping," that "members . . . rotate the responsibility for signing checks," and that "a policy and procedure manual and job descriptions" be published for employees.

In two articles in October 1992, the *Advocate* detailed Chappel's complaints at the October 16, fire-board meeting and the October 22, fiscal-court meeting. With regard to the earlier meeting, the newspaper noted that Chappel complained about the lack of SOPs and the need for an ambulance at the East Main station to improve emergency response times. The second article reported that

[f]ire department employee Bobby Chappel complained . . . that not enough is being done to correct problems at the fire department.

"All I'm asking fiscal court to do is put the (fire) board in line," Chappel said. "I'm not trying to make trouble. I'm just trying to do what's best for the community."

. . . .

Chappel detailed continuing irregularities. . . .

Chappel indicated he believed the problem was at the top—with Chief Wayne Welch.

"Are you saying that the chief doesn't answer to the board?" Montgomery County Judge–Executive Bill Johnson asked.

"How do you answer to the board when you are the board," Chappel replied.

Chappel went as far as to say Welch should step down as chairman of the board.

In November 1992, Welch did, in fact, resign his position as chairman of the fire board. The *Advocate* explained that Welch "was asked by the court to step down due to possible conflicts of interest that could arise due to the multiple positions he occupies."

The *Herald–Leader* also covered Welch's resignation. Additionally, it reported that,

"[i]n September 1993, after at least six years of talk about weak collections, the [ambulance] district's new board replaced Carma Welch with a collection service"; "[w]ithin two months, collections quadrupled." The article also explained that, because of collection problems, the ambulance board had been forced to resort to fund-raising to purchase a new ambulance. It went on to state that "[a]fter . . . audits and Chappel's complaints, the fiscal court ordered the fire and ambulance boards to improve their accounting."

The problem of Welch-family nepotism was addressed in several articles in the *Herald–Leader*. Collectively these articles suggested that Welch and several members of his family had received unauthorized or inappropriate benefits, including free housing, insurance coverage, and premium cable channels. One article noted that Phillip Welch, Welch's brother who served as a firefighter and a member of the fire board, lives rent-free in a fire-district apartment.

In his deposition, John Lane explained that, for several years before he joined the ambulance board, he conducted the annual audit of the ambulance district's finances. Lane testified that, "over the years," he complained about the fact that

one of [Welch's] daughters[, the one who] ran . . . the restaurant, Dad's Grill, was on the insurance policy without adequate reimbursement—without any reimbursement[; t]here were approximately 30 cable TV hookups throughout the county in various fire buildings; [and] premium channels were being charged. [Lane also] believe[d that] at one time [Welch's] wife may have also been on either a cancer policy or a dental policy or some policy where only full-time people should have been present.

Lane stated that he repeatedly criticized Carma Welch's performance, and he also "reported[,] for a couple of years in a row," his belief that Welch should not serve as both fire chief and chairman of the fire board.

### E.

In September 1994, Chappel filed suit against Welch; Dr. Jones; George Updike, the assistant fire chief and a member of the

fire board; three other members of the fire board—Phillip Welch, Roger Minnich, and Wendell Walters; and four members of the ambulance board—Lane, Schwartz, Schoen McCormick, and Thomas Thornberry, all in their individual and official capacities. Chappel also named the fire district and the ambulance district as defendants.

Chappel alleged that the defendants had taken various adverse employment actions against him in retaliation for his persistent criticism of Welch, Welch's family, and the fire and ambulance districts. Chappel claimed "a pattern of retaliatory conduct" which included, but was not limited to, assigning Chappel exclusively to the East Main station and refusing to hire him as a paramedic. Chappel pleaded violations of the First Amendment, pursuant to 42 U.S.C. § 1983; section 1 of the Kentucky Constitution; and Ky.Rev.Stat. Ann. § 61.102.

After extensive discovery, the defendants filed a joint motion for summary judgment. With regard to Chappel's section 1983 claims, the defendants argued that they were entitled to summary judgment because Chappel had failed to establish that he had engaged in protected speech. The individual defendants argued further that, even if Chappel's speech was protected, they were entitled to qualified immunity from liability in their individual capacities because reasonable officials would not have known that Chappel's speech was protected. With regard to liability in their official capacities, the individual defendants argued, as did the fire and ambulance districts, that they were entitled to summary judgment because Chappel had failed to allege the existence of an unconstitutional policy.

Additionally, understanding Chappel's complaint to allege retaliation solely with regard to the August 1992 assignment to the East Main station and the August 1994 refusal to hire, various individual defendants argued that they were entitled to partial summary judgment because they had not participated in or been responsible for the assignment, the refusal to hire, or both. Finally, the defendants argued that any claims flowing from Chappel's assignment to the East Main station were barred by the statute of limitations.

The district court denied the defendants' motion for summary judgment. First, it concluded that the statute of limitations did not bar Chappel's claims regarding his assignment to the East Main station. Second, the district court concluded that Chappel's speech was protected for purposes of the First Amendment. It found that Chappel had spoken on matters of public concern, and that his interest in his speech outweighed any government interest in regulating his speech. With regard to this later conclusion, the court explained, in part, that "[t]here is no suggestion by the Board that [Chappel] ... violated any established policy, or that his public statements were detrimental to the efficiency of the public function of the Board."

Unfortunately, the remainder of the district court's opinion is not so clear. Under the heading "qualified immunity," the district court recited and applied the standards which govern official-capacity liability. It appears that the district court confused and conflated the defendants' separate requests for summary judgment in their individual and official capacities. Thus, the court explained that it was rejecting the defendants' claims to qualified immunity because "[i]t is unclear from the record and from the arguments at the pre-trial conference exactly who maintained final authority to make employment decisions which effected [sic] the Plaintiff in this case."

On March 6, 1996, the ten individual defendants filed notice of appeal. Recognizing that the district court had denied the individual defendants' claims to qualified immunity "because of unresolved factual issues," this court directed the defendants to show cause why their appeal should not be dismissed. The defendants responded by affirming that they were "only appealing the legal determinations made by the district court in denying qualified immunity, not the district court's determination regarding 'evidentiary sufficiency.'"

Specifically, the defendants represented that they were seeking review of the legal questions whether Chappel engaged in

speech on a matter of public concern, whether Chappel's interest in this speech outweighed the government's interest in regulating such speech, and whether the defendants' conduct was objectively reasonable for purposes of qualified immunity. This court withdrew the show-cause order on the basis of the "defendants['] assert[ion] that ... they are seeking review of the threshold determination of whether plaintiff asserted a violation of a constitutional right."

## II.

### A.

Notwithstanding their response to this court's order to show cause, the defendants have not confined their arguments on appeal to the "legal determinations made by the district court." To the contrary, the defendants have dedicated a substantial portion of their brief to the argument that particular defendants are entitled to qualified immunity because they did not participate in, were not aware of, or did not have the authority to affect the decisions to assign Chappel to the East Main station and to not hire Chappel as a paramedic. This argument is a direct challenge to the district court's conclusion that "exactly who maintained final authority to make [the challenged] employment decisions" was genuinely in dispute. For the reasons that follow, we will not consider the defendants' challenge to this fact-based finding.

Two principles are settled with regard to the scope of our jurisdiction over an interlocutory appeal from the denial of a defendant's claim of qualified immunity on summary judgment. First, this court has jurisdiction to hear an appeal of the "separable" and "abstract issu[es] of law" that were "necessarily determined" by the district court's denial, even where, as here, the district court "denie[s] the motion with the unadorned statement that material issues of fact remain." *Behrens v. Pelletier*, 516 U.S. 299, ——, ——, 116 S.Ct. 834, 838, 842, 133 L.Ed.2d 773 (1996) (internal quotation marks and brackets omitted). Second, this court does not have jurisdiction to hear such an appeal where "what is at issue ... is *nothing more* than whether the evidence could support a finding that particular conduct occurred." *Id.* at ——, 116 S.Ct. at 842 (emphasis added); *see Johnson v. Jones*, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Where, however, what is at issue includes abstract questions of law which this court has jurisdiction to consider, it is an open question whether this court will also exercise pendent appellate jurisdiction over related questions of fact. *See Johnson*, 515 U.S. at 318, 115 S.Ct. at 2158; *McCloud v. Testa*, 97 F.3d 1536, 1545 (6th Cir.1996).

In their motion for summary judgment and in their brief on appeal, the defendants have argued that they are entitled to qualified immunity because Chappel's speech was not protected under the First Amendment. In the alternative, they have also argued that, even if Chappel's speech was protected, they are entitled to qualified immunity because this protection was not clearly established. These issues, which were "necessarily determined" by "the [d]istrict [c]ourt's denial of [the defendants'] summary-judgment motion," *Behrens*, at ——, 116 S.Ct. at 842, are precisely the sort of abstract legal questions this court has jurisdiction to consider on interlocutory appeal, *see, e.g., Thomas v. Whalen*, 51 F.3d 1285, 1289–92 (6th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 518, 133 L.Ed.2d 426 (1995); *Williams v. Commonwealth of Ky.*, 24 F.3d 1526, 1532 (6th Cir. 1994).

This is not, then, a case in which the defendants press nothing more than their challenge to the district court's finding that "the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at 319, 115 S.Ct. at 2159. The defendants do not, however, make an express appeal to the doctrine of pendent appellate jurisdiction. Instead, they rely on *Vaughn v. United States Small Business Administration*, 65 F.3d 1322 (6th Cir.1995), *reh'g denied*, 82 F.3d 684, for the argument that this court "ha[s] the ability to review on interlocutory appeal the factual inquiry of whether a defendant had the discretionary authority to make the decision which resulted in plaintiff's cause of action."

*Vaughn* does not, however, establish that this court may review, on interlocutory ap-

peal from the denial of a defendant's summary-judgment motion for qualified immunity, the district court's finding that material facts are genuinely in dispute. In *Vaughn,* the defendant argued, and the court agreed, "that under the facts as alleged by [the plaintiff], [the defendant] did not violate any ... clearly established rights." *Vaughn,* 82 F.3d at 685. Thus, *Vaughn* "technically employed a Fed.R.Civ.P. 12(b)(6) analysis," *id.* at 685, which "this court may consider in reviewing qualified immunity interlocutory appeals," *McCloud,* 97 F.3d at 1545 n. 12. As we have indicated, we fully intend to consider the defendants' legal argument that, even on the facts taken in the light most favorable to Chappel, Chappel has failed to state a claim under section 1983. This consideration, however, is far different from a reconsideration of the district court's conclusion that certain material facts are genuinely in dispute.

Moreover, even if we have the discretionary authority to exercise pendent appellate jurisdiction over the district court's finding regarding the sufficiency of the evidence, we decline to exercise our discretion in this case. *See McCloud,* 97 F.3d at 1545 n. 11. Among other reasons, we are reluctant to review the defendants' fact-based arguments because the defendants have misread the scope of Chappel's complaint. In both their motion for summary judgment and their brief on appeal, the defendants have treated Chappel's complaint as if it alleges only two acts of retaliation: the assignment to the East Main station and the refusal to hire Chappel as a paramedic. A review of Chappel's complaint, his responses during discovery, and his brief in reply to the defendant's motion for summary judgment, however, makes it clear that Chappel has at all times alleged acts of retaliation other than those addressed by the defendants.

## B.

■ Public officials acting within the scope of their discretionary authority "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800,

818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). We conduct *de novo* review of the district court's denial of a defendant's motion for summary judgment on the basis of qualified immunity, because, as we have noted, "the issue whether qualified immunity is applicable to an official's actions is a question of law." *Dickerson v. McClellan,* 101 F.3d 1151, 1157 (6th Cir.1996).

■ Where the plaintiff alleges a constitutional violation, we look first to determine "whether, based on the applicable law, a constitutional violation occurred." *Id.* If we find a violation, we then consider "whether it involved clearly established constitutional rights of which a reasonable person would have known." *Id.* at 1158 (internal quotation marks and citation omitted); *accord Blair v. Meade,* 76 F.3d 97, 100 (6th Cir.1996). The defendants' presentation of their arguments is consistent with this ordering of our review.

## C.

Accordingly, the defendants argue first that they are entitled to qualified immunity because Chappel's speech does not constitute speech on a matter of public concern, and, therefore, he has not stated a claim under the First Amendment. In so doing, the defendants have identified and responded to Chappel's speech regarding: (1) the need for a paramedic program; (2) poor collections and gross financial mismanagement; (3) the misappropriation of funds, including the payment of unearned benefits to Welch family members; (4) nepotism; (5) Welch's alleged conflict of interest as both fire chief and chairman of the fire board; and (6) the need for standard operating procedures and improved training for fire-district employees. Contrary to the defendants' arguments, we believe that Chappel's speech on these matters constituted speech on matters of public concern.

■ The First Amendment protects a public employee from adverse employment action taken in retaliation for his speech, if his speech may be "fairly characterized as constituting speech on a matter of public concern" and his interest in that speech is not outweighed by "the interest of the State,

as an employer, in promoting the efficiency of the public services it performs." *Connick v. Myers*, 461 U.S. 138, 146, 157, 103 S.Ct. 1684, 1690, 1695, 75 L.Ed.2d 708 (1983) (internal quotation marks and citation omitted). Whether speech addresses a matter of public concern is a question of law, *Williams*, 24 F.3d at 1532, "determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. In order to conclude that speech addresses a matter of public concern, "this court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community." *Rahn v. Drake Center, Inc.*, 31 F.3d 407, 412 (6th Cir.1994).

### 1.

The defendants' most sweeping argument is that *none* of Chappel's speech may be considered speech on a matter of public concern because *all* of his speech was fundamentally and predominantly motivated by his self-interest in obtaining a position as a paramedic with the ambulance district. To this end, the defendants argue that Chappel complained about poor collections and financial mismanagement solely because he was interested in securing financing for the paramedic program. They also suggest that Chappel "lashed out against Chief Welch and the rest of his family," alleging misappropriations, nepotism, and a conflict of interest, only because "he believed that they were standing in his way."

The defendants' argument, that Chappel's subjective motivations are dispositive when determining whether his speech addresses a matter of purely personal concern, is in direct conflict with the Supreme Court's holding in *Connick*. In *Connick*, a public employee disseminated a questionnaire "to gather ammunition for another round of controversy with her superiors" because she was "dissatisf[ied] with a transfer." *Connick*, 461 U.S. at 148, 103 S.Ct. at 1691. Notwithstanding the fact that this personal grievance motivated the entire questionnaire, the Court concluded that "[o]ne question in [the] questionnaire ... touch[ed] upon a matter of public concern." *Id.* at 149, 103 S.Ct. at

1691. We agree, as a majority of the Third Circuit recently concluded, that "[i]f motive were dispositive, the [Court's] inquiry [in *Connick* ] could only have resulted in finding either that all of [the employee's] speech was public concern speech or that none of it was." *Azzaro v. County of Allegheny*, 110 F.3d 968, 978 (3d Cir.1997) (*en banc* ).

*Connick's* holding in this regard is not remarkable. Indeed, the argument that an individual's *personal* motives for speaking may dispositively determine whether that individual's speech addresses a matter of *public* concern is plainly illogical and contrary to the broader purposes of the First Amendment. Matters of public concern are those that may be "fairly characterize[d] ... as relating to any matter of political, social, or other *concern to the community.*" *Rahn*, 31 F.3d at 412 (emphasis added). Speech on such matters is protected because the First Amendment is concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information. *See Connick*, 461 U.S. at 145, 149, 103 S.Ct. at 1689, 1691; *Pickering v. Board of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 571–72, 88 S.Ct. 1731, 1736–37, 20 L.Ed.2d 811 (1968). In fact, "the core value of the Free Speech Clause of the First Amendment" is "[t]he public interest in having free and unhindered debate on matters of public importance." *Pickering*, 391 U.S. at 573, 88 S.Ct. at 1737. It is *because* of this core value that "it is essential that [public employees] be able to speak out freely on ... questions [of public concern] without fear of retaliat[ion]." *Id.* at 572, 88 S.Ct. at 1736.

In making their argument that Chappel's motivations deprive his speech of constitutional protection, the defendants rely heavily on this court's decision in *Brown v. City of Trenton*, 867 F.2d 318 (6th Cir.1989). In particular, the defendants seize on this court's statement that

> *Connick* instructs us to examine both the content and the context of the employee's statement, ... and the Court's opinion seems to suggest that if, having done so, we find that the employee's personal interest *qua* employee predominates over any

interest he might have as a member of the general public, we are not to intercede. *Id.* at 322. This court's interpretation of *Connick* was based on the Supreme Court's explanation that *Connick*

> "hold[s] ... that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

*Id.* at 321 (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690). According to the defendants' argument, these passages establish that a public employee's speech does not address a matter of public concern where the employee's predominant motive for speaking is not a matter of public concern.

We have already explained how this argument is inconsistent with *Connick*'s holding and rationale, and it should be clear that the defendants have misinterpreted *Brown.* Whether an employee's statement is predominated by "the employee's personal interest *qua* employee" is primarily a content-based inquiry, not an exclusively motive-based inquiry. The fundamental distinction recognized in *Connick* is the distinction between *matters* of public concern and *matters* only of personal interest, not civic-minded motives and self-serving motives. *See Azzaro,* 110 F.3d at 979 n. 5.

Although the defendants have not relied upon this court's decision in *Dambrot v. Central Michigan University,* 55 F.3d 1177 (6th Cir.1995), we believe it would be helpful to take a moment to explain how that opinion is consistent with our present holding. In *Dambrot,* the plaintiff, the former head coach of a public university's basketball team, alleged that he had been fired in violation of the First Amendment for using the word "nigger" in conversations with his players. *Id.* at 1180–81. In determining that the plaintiff's use of this word did not constitute speech on a matter of public concern, this court understandably focused on an attempt to discern the meaning to be attributed to

the plaintiff's use of the word. *Id.* at 1187–88. Thus, this court sought to determine: "the point of the speech in question"; "to what purpose the employee spoke"; "the intent of the speech"; and "the communicative purpose of the speaker." *Id.* (internal quotation marks, emphasis, and citation omitted). In this context, we noted the plaintiff's testimony that he had used the word " 'to connote a person who is fearless, mentally strong and tough.' " *Id.* at 1180.

*Dambrot*'s focus on discerning the intent, connotation, or communicative purpose of the plaintiff's speech in that case should not be confused with the defendants' suggestion that we should focus on Chappel's motivations for speaking. Although the motive behind the plaintiff's speech in *Dambrot* was closely related to the meaning the plaintiff intended his speech to convey, the inquiry into what a speaker intends to communicate remains fundamentally different from an inquiry into why the speaker intends that communication. The former inquiry is of much greater significance in determining whether speech addresses a matter of public concern. Thus, in *Dambrot,* this court concluded that the plaintiff's speech was not protected because it "imparted no socially or politically relevant message to his players." *Id.* at 1187.

Because the plaintiff in *Dambrot* based his claim on the use of a single word, a word which is commonly understood as an epithet, determining the meaning or the "communicative purpose" of the plaintiff's speech was unusually difficult. By way of contrast, in *Thomas,* 51 F.3d 1285, the meaning of the plaintiff's speech was clear. The plaintiff unambiguously criticized gun-control legislation, and this court readily concluded that the plaintiff's speech was speech on a matter of public concern because "[t]he debate over the propriety of gun control legislation is, obviously, a matter of public concern." *Id.* at 1290. Notwithstanding the fact that the plaintiff's essay expressing his views on gun control was entitled "Why Gun Laws Waste My Time," this court felt no need to ignore the "obvious[ness]" of this conclusion in order to explore the plaintiff's subjective motivations for opposing gun control.

*Connick* instructs us that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91. It does not instruct us to examine the content, form, and context of the statement merely to determine the motive of the speaker, just as it does not instruct us to determine whether the speaker has addressed a matter of public concern by merely attempting to discern the speaker's motive.

Rather, given *Connick*'s holding, our case law, and the underlying rationale for protecting the speech of public employees, we think it is clear that "[t]he motive which underlies an employee's statements is a relevant, but not necessarily dispositive factor" when considering whether an employee's statements may be fairly characterized as relating to any matter of political, social, or other concern to the community. *Cliff v. Board of Sch. Comm'rs of Indianapolis, Indiana*, 42 F.3d 403, 409 (7th Cir.1994). We will discuss the significance of this factor in this case after considering the defendants' other arguments for concluding that Chappel's speech did not address matters of public concern.

### 2.

The defendants argue that Chappel's speech regarding the mismanagement and misappropriation of public funds is not speech on a matter of public concern because it "is nothing more than accusations of incompetent management," and Chappel "has presented no 'concrete evidence' that 'public corruption' occurred." Similarly, the defendants argue that Chappel's speech regarding Welch's alleged conflict of interest was not protected because Chappel "has produced no evidence of an actual conflict of interest." Once again, we believe that the defendants have misinterpreted the relevant case law.

■■■■ The defendants are quite right that "[t]he mere fact that public monies and government efficiency are related to the subject of a public employee's speech do[es] not, by [itself], qualify that speech as being addressed to a matter of public concern." *Barnes v. McDowell*, 848 F.2d 725, 734 (6th Cir.1988). This means, for example, that a public employee's complaint that a coworker spends too much time at the water cooler does not become a matter of public concern simply because that coworker is paid by the state. It does not mean, however, that speech which directly alleges the mismanagement and misappropriation of public monies is not, without more, a matter of public concern. Quite to the contrary, "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law," when "expos[ing] graft and corruption," and when "seeing that public funds are not purloined" or wasted. *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir.1986); *accord Solomon v. Royal Oak Township*, 842 F.2d 862, 865–66 (6th Cir. 1988).

■■■■ The defendants would have us hold, nonetheless, that Chappel's speech on such matters was not protected because he did not provide any evidence to substantiate the allegations contained in his speech. The defendants in *Williams* made a similar argument, and this court made it clear that such evidence is not required. *See Williams*, 24 F.3d at 1535–36 & n. 3. A public employee is not required to prove the truth of his speech in order to secure the protections of the First Amendment. *See id.; see also Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1736–37. To the contrary, although protection may not be available when a public employee knowingly or recklessly makes false statements, it is the defendants' burden to establish that Chappel knew or was recklessly indifferent to the fact that his speech was false. *Williams*, 24 F.3d at 1535–36. The defendants have not alleged, let alone proved, such facts, and we note that what evidence there is in the record in this regard suggests that Chappel's speech was reasonably grounded in fact, if not entirely meritorious.

In support of their argument, the defendants rely on this court's statement in *Barnes*, 848 F.2d 725, that

[w]hile [the plaintiff] may have been justified in his beliefs that his section of the Business Enterprises Program did not receive enough of the operating budget, that

the Program should have had a 24–hour repair deadline before he instituted one and that the wisdom and propriety of some of the Program's purchasing practices was questionable, he presented no evidence linking any of these charges to corruption in the Bureau or in the Program. Consequently, instead of having addressed a matter of public concern, [the plaintiff's] complaints appear to be nothing more than examples of the quintessential employee beef: management has acted incompetently.

*Id.* at 734–35 (footnote, internal quotation marks, and citation omitted). In *Barnes,* the plaintiff filed a complaint in which he alleged that he had been fired, in part, for raising allegations of corruption which were clearly matters of public concern. *Id.* at 728 & n. 4. However, after having "been afforded full opportunity to conduct discovery," the plaintiff was unable to "supply the district court with concrete evidence supporting the *allegations raised in his complaint.*" *Id.* at 734 (emphasis added). In other words, the plaintiff's failure was not a failure to substantiate the *allegations of his speech,* but, rather, was the more fundamental failure to establish that his speech had addressed corruption or any other matters of public concern. *Id.* at 734–35; *see Dambrot,* 55 F.3d at 1186 n. 8; *accord Rahn,* 31 F.3d at 413–14 & n. 9. Thus, *Barnes* does not support the defendants' contention that Chappel's speech, alleging corruption and unethical conduct, cannot address matters of public concern absent proof of the truthfulness of his speech.

### 3.

The defendants' next argument is that Chappel's speech with regard to nepotism and the mismanagement of the ambulance district's finances was not protected because Chappel did not *disclose* these issues to the public. The defendants argue that these issues were already known to the public, and "Chappel has failed to cite to any case law stating that merely reiterating already released public information is a matter of public concern." In fact, the defendants go so far as to suggest that Chappel's speech regarding the "misappropriation of public monies" was not protected after the August 4, 1992, meeting, because this later speech did not " 'expose' any public corruption, but merely reiterated his speech from the [earlier] meeting."

As the defendants recognize, "[t]his Court has held that speech disclosing public corruption is a matter of public interest." *Solomon,* 842 F.2d at 865. This holding does not, however, imply that speech which addresses public corruption, but does not disclose it in the first instance, is *not* protected. Indeed, the defendants' suggestion that such speech is not protected, by virtue of its second-in-time status, is absurd. The First Amendment "was fashioned to assure [the] unfettered *interchange* of ideas," *Connick,* 461 U.S. at 145, 103 S.Ct. at 1689 (internal quotation marks and citation omitted) (emphasis added), and "free and open *debate* ... vital to informed decision-making by the electorate," *Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736 (emphasis added).

In *Rahn,* this court noted, as a factor in its review, the fact that the plaintiff had not " 'uncovered' a fraud" or " 'disclose[d]' any public corruption." *Rahn,* 31 F.3d at 413. There were, however, two significant components to this observation: first, the facts addressed by the plaintiff's speech were not unknown to the public, *id.;* and, second, and more importantly, the plaintiff's speech did not allege fraud or corruption, *id.* at 413–14 & n. 9.

We accept, of course, that speech which breaks a story may be of greater concern to the public than speech which merely repeats a story. What we reject is the suggestion that speech which comes late to a public debate is unprotected simply because the controversy has already been defined. Given that the First Amendment extends to protect inappropriate and offensive contributions to public debate, *see Rankin v. McPherson,* 483 U.S. 378, 387, 107 S.Ct. 2891, 2898–99, 97 L.Ed.2d 315 (1987), and speech which is greeted by the public "with massive apathy and total disbelief," *Pickering,* 391 U.S. at 570, 88 S.Ct. at 1736, it should be clear that a public employee's speech need not be fresh and enlightening to

be considered speech on a matter of public concern.

## 4.

Having responded to the broader legal arguments upon which the defendants rely, we now turn our attention to the particular speech at issue in this case.

■ As we have indicated, the defendants' principal argument is that Chappel's speech was not protected because the evidence in the record establishes that the speech was predominantly motivated by Chappel's desire to secure a position as a paramedic with the ambulance district. In support of their contention that this motive is clear from the record, the defendants rely mainly on the timing of Chappel's complaints and his admitted desire not to have to work outside of the district to maintain his paramedic license. With regard to the former, the defendants point out that many of Chappel's complaints address conduct which had been occurring for years, but about which Chappel only chose to complain after he became a paramedic.

We do not believe that Chappel's motivations may be so conclusively deduced from the record. Although it is true that the timing of Chappel's speech was roughly coincident with Chappel's certification as a paramedic, it is also true that his speech quite naturally followed the ambulance district's decision to upgrade to paramedic/ALS service. Chappel's speech followed even more closely on the heels of the state's fiscal grant in support of the paramedic program, which, by all accounts, was not readily put to use. More importantly, in light of Chappel's choice of fora and the content of his speech, we simply cannot conclude that the motives imputed to Chappel by the defendants are sufficient to render Chappel's speech unprotected.

We may quite readily concede that Chappel hoped to gain from his speech. Indeed, this may be a fair assumption to make about most speech addressing matters of public concern. Our aim, however, is to determine whether Chappel's speech may be "fairly characterize[d] ... as relating to any matter of political, social, or other concern to the community." Even if we were to assume that Chappel's predominant motivation for speaking was securing a job for himself, we would not conclude that this motivation so dominated the substance of Chappel's speech that the "point" or "communicative purpose" of his speech was rendered merely a matter of personal concern. Chappel directly addressed matters that are rightly "near [the] zenith" of public concern—matters of public safety, and the gross mismanagement and misappropriation of public monies. Chappel raised these matters repeatedly in public fora, and his speech on these matters was almost entirely undiluted by speech indicating purely personal interests. Furthermore, although public interest does not always signal a matter of true public concern, the newspaper articles contained in the record reveal that the public reaction to Chappel's speech was neither apathetic nor simply voyeuristic. To the contrary, these articles reveal that Chappel's speech played a leading role in an active interchange of ideas aimed at effecting political and social change.

In this context, then, it seems clear to us that Chappel's speech regarding the need for or the value of the paramedic service was speech on a matter of public concern. In fact, the defendants concede that the public would be interested in the implementation of a paramedic service. Speech on matters directly affecting the health and safety of the public is obviously a matter of public concern. *See, e.g., Gustafson v. Jones,* 117 F.3d 1015, 1021 (7th Cir.1997); *Caldwell v. City of Elwood,* 959 F.2d 670, 672 (7th Cir.1992). Indeed, "[f]ew subjects are of more public concern ... than the provision of basic fire and rescue services." *Beckwith v. City of Daytona Beach Shores,* 58 F.3d 1554, 1564 (11th Cir.1995). We find nothing in the content, form, or context of Chappel's speech which dissuades us from this conclusion.

■ For similar reasons, we find that Chappel's speech regarding the need for SOPs and improved training was speech on a matter of public concern. Firefighters train and operate to serve and protect the public from significant dangers. Indeed, we are somewhat mystified by the defendants' casu-

al suggestion that "[t]he public would have a very limited interest ... in whether the Fire Department had a SOP or whether specific fire fighters desired additional training." Chappel's speech on these issues was clearly within the ambit of the First Amendment's protection.

■ We also find that Chappel's criticism of the ambulance district's financial problems was a matter of public concern. This is not a case where the criticism of minor inefficiencies is held up as a matter of public concern simply because the public fisc is implicated. Rather, Chappel's speech addressed a critical revenue-shortfall deriving from a basic failure to collect debts and properly manage the ambulance district's budget. Furthermore, Chappel's speech linked this financial failure to deficiencies in the ambulance district's provision of lifesaving services.

■ Chappel's speech alleging that Welch and his family members were misappropriating public monies is obviously a matter of public concern. Furthermore, it is clear, in light of these particular allegations of corruption and Chappel's additional speech blaming Carma Welch for the ambulance district's financial woes, that Chappel's speech regarding Welch's alleged nepotism and conflict of interest was speech on a matter of public concern. In essence, Chappel's speech alleged that Welch's favoritism for his family resulted in the payment of unearned benefits and the gross mismanagement of the ambulance district's finances. In this context, that is, Welch being charged with corruption and nepotism, Chappel's suggestion that Welch should not serve as both fire chief and chairman of the fire board was also obviously a matter of public concern.

■ Finally, we note that Chappel alleges that he spoke to various members of the boards in private meetings. For example, Chappel alleges that he spoke to Schwartz about the ambulance district's collection problems, and to Minnich about misappropriations and Welch-family nepotism. Constitutional protection for speech on matters of public concern is not premised on the communication of that speech to the public. *See Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–

90 (citing *Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)). There is nothing in the circumstances of this case that suggests that Chappel's speech on any of the matters we have discussed was any less a matter of public concern when it was made privately. To the extent, then, that Chappel spoke with individual board members about these important matters, we conclude that Chappel spoke on matters of public concern.

### D.

In addition to arguing that Chappel's speech was not speech on a matter of public concern, the defendants argue that Chappel's speech was not protected because their legitimate interests in regulating Chappel's speech outweighed Chappel's interest in his speech. Accordingly, the defendants argue that the decisions to assign Chappel to the East Main station and to refuse to hire Chappel as a paramedic were constitutionally permissible. *See, e.g., Meyers v. City of Cincinnati*, 934 F.2d 726, 730 (6th Cir.1991). The defendants did not raise this argument in their motion for summary judgment below, and we see no extraordinary reason to consider it for the first time on appeal. *See, e.g., Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 143 (6th Cir.1997). We do not, by this observation, mean to foreclose consideration of the question in the district court on remand.

### E.

The defendants' final argument is that they are entitled to qualified immunity because reasonable officials could have believed that Chappel's speech did not address matters of public concern.

■ To determine whether a right was clearly established for purposes of qualified immunity, this court "look[s] first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Williams*, 24 F.3d at 1533 (internal quotation marks and citations omitted). Although this court must consider whether a reasonable official would have known that the particular conduct at issue violated clearly

established law, *see Guercio v. Brody,* 911 F.2d 1179, 1184 (6th Cir.1990), it is not necessary to find that the particular conduct at issue have previously been held unlawful, *Williams,* 24 F.? 1 at 1533. Rather, if the contours of the right alleged to have been violated were clearly established, the defense of qualified immunity should ordinarily fail. *Dickerson,* 101 F.3d at 1158. If, however, "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *McCloud,* 97 F.3d at 1553 (internal quotation marks and citations omitted).

The defendants have raised numerous arguments in support of their position that Chappel's speech did not address matters of public concern, and we have responded to these arguments at length. 'The number of the defendants' arguments and the length of our responses, however, should not be taken as an indication that the defendants have pressed a colorable defense.

 To the contrary, our discussion of the defendants' arguments should make it clear that the conclusion that Chappel's speech addressed matters of public concern was clearly dictated by established law and common sense. All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern, and no reasonable public official understanding this charge could conclude that Chappel's speech did not address such matters.

### III.

For all of the foregoing reasons, the district court's judgment denying the defendants' motion for summary judgment on the basis of qualified immunity is **AFFIRMED.**