raised the matters repeatedly in public fora (although the court noted that Chappel's private speech was also protected), his "speech on these matters was almost entirely undiluted by speech indicating purely personal interests," and there was strong public interest in his speech. *Id.* at 578. Unlike Chappel, however, Perry's speech addresses only his personal interests.

For these reasons, I would affirm the district court's dismissal of Perry's free speech claim arising from his workplace complaints of race discrimination because his speech involved only a personal employment dispute, not a matter of public concern.

Finally, because I would affirm the dismissal of Perry's First Amendment allegations, I would also affirm the dismissal of his substantive due process claim.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0133P (6th Cir.)
File Name:  00a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT



EVERETT PERRY,
  *Plaintiff-Appellant,*

  *v.*                    No. 98-1607

KENNETH MCGINNIS, et al.,
  *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-71373—Patrick J. Duggan, District Judge.

Argued:  November 4, 1999

Decided and Filed:  April 13, 2000

Before:  KEITH, NORRIS, and CLAY, Circuit Judges.

_____

### COUNSEL

**ARGUED:**    William   Goodman,   CENTER   FOR CONSTITUTIONAL RIGHTS, New York, New York, for Appellant.   Frank J. Monticello, OFFICE OF THE ATTORNEY GENERAL, PUBLIC EMPLOYMENT AND ELECTIONS DIVISION, Lansing, Michigan, for Appellees. **ON BRIEF:**  Julia Ila Sherwin, HADDAD & SHERWIN,

Oakland, California, for Appellant.  Frank J. Monticello, OFFICE OF THE ATTORNEY GENERAL, PUBLIC EMPLOYMENT AND ELECTIONS DIVISION, Lansing, Michigan, for Appellees.  Frederick M. Baker, Jr., HONIGMAN, MILLER, SCHWARTZ & COHN, Lansing, Michigan, for Amicus Curiae.

KEITH, J., delivered the opinion of the court, in which CLAY, J., joined.  NORRIS, J. (pp. 21-24), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

DAMON J. KEITH, Circuit Judge.  Plaintiff-Appellant Everett Perry ("Perry") appeals from the district court's decisions on Defendants-Appellees'[1] (the "prison officials") motion for summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56(c) and motion to dismiss for failure to state a claim upon which relief can be granted pursuant to FRCP 12(b)(6).  We **REVERSE** the district court's decisions and **REMAND** for further consideration consistent with this opinion.

**I. Background**

On October 30, 1988, Perry, a Black man, was hired by the Michigan Department of Corrections (the "MDOC") as an Administrative Law Examiner ("ALE").  Specifically, he worked for the MDOC's Office of Policy and Hearings as a hearing officer and decision maker in major misconduct

———————————

[1]Defendants-Appellees are Kenneth McGinnis, Director of the Michigan Department of Corrections (the "MDOC"); Richard Stapleton, Manager of the Hearings and Appeals Division of the Office of Policy and Hearings for the MDOC; Marjorie Van Ochten, Administrator of the Office of Policy and Hearings for the MDOC; and Leonard Den Houter, Supervisor of the Office of Policy and Hearings for the MDOC.

inherently of public concern." *Connick*, 461 U.S. at 148 n.8.  The Court also noted, however, that the speech at issue in *Givhan* was "not tied to a personal employment dispute." *Id.*  Furthermore, this court has determined that "[t]he fact that an employee alleges discrimination on the part of a public employer is not itself sufficient to transform the dispute into a matter of public concern." *Jackson v. City of Columbus*, 194 F.3d 737, 746 (6th Cir. 1999).  In *Jackson*, a public employee alleged that his right to freedom of speech was violated when the city imposed a gag order on him, forbidding him from speaking with the news media about an investigation into his alleged misconduct while the investigation was pending. *See id.*  The court focused on several points when holding that Jackson had sufficiently alleged that his speech involved a matter of public concern.  First, the court noted that Jackson was not an ordinary employee, but a high-profile member of the community. *Id.* at 747.  Furthermore, the court indicated that "[b]ecause the investigation involved allegations of corruption and abuse of power within the Division of Police, as well as the City's allegedly racial motivations, the gag order could be construed as *covering more than a private employment dispute*." *Id.* (emphasis added).  Unlike the plaintiff in *Jackson*, there is no indication that Perry is alleging speech regarding anything other than his personal employment dispute.

The case relied upon by the majority, *Chappel v. Montgomery County Fire Protection District No. 1*, 131 F.3d 564 (6th Cir. 1997), does not alter my conclusion.  In *Chappel*, the public employee spoke about his concerns as to serious problems with the finances and management of the fire and ambulance districts in his area.  Chappel had a personal motivation for the speech: if enough people agreed with his concerns, his career could benefit.  However, this court did not deem Chappel's desire to gain from his speech as dispositive, even assuming that his predominant motivation for the speech was to secure a job for himself. *See id.* at 578.  Instead, the court determined that the context showed Chappel's speech was on a matter of public concern because he addressed matters "near the zenith" of public concern, he

While MDOC's alleged guilty verdict quota may be improper, the First Amendment is not an appropriate means to address the problem.

I also disagree with the majority's reliance upon *Parate v. Isibor*, 868 F.2d 821 (6th Cir. 1989). In *Parate*, this court determined that the assignment of a letter grade is symbolic communication intended to send a specific message to a student, noting that "[t]he message communicated by the letter grade 'A' is virtually indistinguishable from the message communicated by a formal written evaluation indicating 'excellent work.'" *Id.* at 827. In the present case, an analogous message is not at issue. Perry has not suggested that appellees have interfered with the message of his opinions to individual prisoners that they were or were not guilty of misconduct. Instead, Perry focuses on alleged speech about MDOC's requirements for numbers of guilty verdicts. This purported message cannot be implied from Perry's ALE findings with the ease that a message of "excellent work" can be implied from the assignment of a letter grade "A." Nor do I find the question of academic freedom analogous to the present situation.

For these reasons, I disagree with the majority's determination that Perry engaged in speech on a matter of public concern through his ALE findings. Therefore, I would affirm the district court's dismissal of Perry's First Amendment claim premised on speech in his ALE findings, albeit on a different ground than that articulated by the district court.

The majority also holds that Perry's internal grievance of racially disparate treatment is a matter of public concern. I disagree. A determination of whether speech involves a matter of public concern must be based on the content, form, and context of a given statement, as revealed by the whole record. *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). While discussing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415-16 (1979), the Supreme Court has indicated that racial discrimination is "a matter

disciplinary hearings in Michigan state prisons. On November 5, 1993, Perry was fired.

Perry filed his initial complaint on March 27, 1996. After a volley of motions to dismiss and amended complaints, Perry filed his final amended complaint on September 20, 1996, bringing First and Fifth Amendment claims as well as a Fourteenth Amendment equal protection claim, a claim of equal protection violations in contravention of the Michigan Constitution, and a claim of race discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act (the "ELCRA"). The prison officials subsequently filed a motion to dismiss for failure to state a claim upon which relief can be granted under FRCP 12(b)(6). On March 14, 1997, the court dismissed Perry's First and Fifth Amendment claims, but denied the prison officials' motion with respect to the equal protection and ELCRA claims. Perry, soon thereafter, voluntarily dismissed his equal protection claim brought under the Michigan Constitution. On September 16, 1997, the prison officials filed a motion for summary judgment, and on April 15, 1998, the district court granted summary judgment on the remaining claims. Perry appeals the lower court's grant of summary judgment for the prison officials as well as its grant of the prison officials' motion to dismiss.

## II. Race Discrimination

Perry argues that the district court erred in determining that he failed to raise genuine issues of material fact as to his race discrimination claims under the Fourteenth Amendment and the ELCRA. We agree.

This Court reviews grants of summary judgment *de novo*, and applies the same standard that the district courts apply. That test is set out in FRCP 56(c): "Summary Judgment is only appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying this test, it is well settled that "[t]he evidence of the non-movant is to be believed, and that

all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, summary judgment is generally not well suited for cases in which motive and intent are at issue and in which one party is in control of the proof. *See Cooper v. North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986). In *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988), this Court established that a plaintiff asserting a Fourteenth Amendment equal protection claim under 42 U.S.C. §1983 must prove the same elements required to establish a disparate treatment claim under Title VII of the Civil Rights Act of 1964. Both parties agree that in order to establish a *prima facie* case, the plaintiff must set forth the following elements: "1) he was a member of a protected class; 2) he was subject to an adverse employment action; 3) he was qualified for the job; and 4) for the same or similar conduct, he was treated differently from similarly situated non-minority employees." *Perkins v. University of Mich.*, 934 F.Supp. 857, 861 (E.D. Mich. 1996); *see Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). It should be noted that the plaintiff's race need only be a motivating factor – not necessarily the sole factor – in order for the plaintiff to succeed in his claim. *See Gutzwiller*, 860 F.2d at 1328.

Both parties agree that Perry has satisfied prongs one and two of this test. The parties, however, disagree with respect to prongs three and four. Perry argues that he was qualified for his job and that he was treated differently from his similarly situated White colleagues. The prison officials disagree.

After reviewing the record, it is clear that genuine issues of material fact exist as to whether Perry was qualified and whether he was treated differently from similarly situated colleagues. As such, the district court inappropriately granted summary judgment for the prison officials. We first address the issue of Perry's disparate treatment and then address his qualifications.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

ALAN E. NORRIS, Circuit Judge, concurring in part and dissenting in part. I concur with the majority's decision in Part II and agree that the grant of summary judgment should be reversed with respect to Perry's race discrimination claims under the Fourteenth Amendment and Michigan's Elliott-Larsen Civil Rights Act. However, because Perry did not allege that he engaged in speech involving a matter of public concern, I respectfully dissent from Parts III.A.1, III.A.2.a, III.B, and IV of the majority's opinion and would not reach the issue addressed in Part III.A.2.b.[1]

The majority opinion indicates that Perry's "insistence through his decisions that he be impartial and operate within the confines of constitutional law, constitutes speech on a matter of public concern." I disagree with this conclusion and the implications upon which it relies. In his complaint, Perry alleges that he was terminated because of his "speech and/or conscience in opposing, failing and/or refusing to find a higher percentage of prisoners guilty of misconduct." The complaint later indicates that Perry was deprived of his First Amendment rights when he was disciplined and terminated for "his speech in opposition to . . . unlawful pressure to find more prisoners guilty." In my opinion, it is too great a stretch to imply from Perry's findings as an ALE that he was engaging in speech about MDOC's alleged quotas for guilty verdicts. Perry never alleges that in his ALE findings he discussed his opinion about MDOC's alleged policies or desire for him to find more prisoners guilty and more prison guards credible. Instead, the first time Perry states his opinion of the alleged quotas is in his complaint to the district court.

---

[1]If I were to consider the issue in Part III.A.2.b, however, I would agree with the majority opinion to the extent that it suggests the district court erred in determining that application of the *Pickering* test could only favor appellees.

decision to dismiss Perry's substantive due process claim relating to the fundamental right of free expression is reversed and remanded for further consideration.[6]

### V. Conclusion

For the foregoing reasons, the district court's judgment is **REVERSED**, and the case is **REMANDED**.

---

[6]At one point, Perry pressed a substantive due process claim based on his right to equal protection, but the prison officials accurately note that Perry agreed below to voluntarily dismiss that claim. As such, Perry has forfeited the claim and cannot advance it now.

Considering that under summary judgment analysis all justifiable inferences are to be drawn in favor of the non-movant and the non-movant's evidence is to be believed, it is surprising that the district court decided as it did. This Court has held that to qualify as "similarly-situated" in the disciplinary context, the plaintiff and the colleagues to whom he seeks to compare himself "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. In addition, this Court has asserted that in applying the standard courts should not demand exact correlation, but should instead seek relevant similarity. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Here, all hearing officers were supervised by the same officials, subject to the same standards, and charged with the same duties. They were indeed similarly situated.

Abundant record evidence demonstrates that the prison officials treated Perry differently than these similarly situated non-minority employees. The depositions of non-minority hearing officers, as well as other portions of the record, are replete with instances of disparate treatment. The following represent just a few examples.

The prison officials disciplined Perry on several occasions for typographical errors. Hearing Officer Thomas Craig testified in his deposition that he commits a typographical error in every hearing report that he does. The prison officials, however, have never disciplined Craig for such errors. Similarly, Hearing Officer Miriam Bullock testified in her deposition that she commits a typographical error in all of her hearing reports. Like Craig, Bullock has never been cited for such errors.

Perry failed to correct an incorrect inmate number (that a corrections officer wrote) on a disciplinary ticket, and was disciplined. Officer Bullock *herself* once typed the wrong inmate number for a prisoner, resulting in the wrong prisoner

receiving a guilty finding in his record. The prison officials, however, did not discipline her.

The prison officials disciplined Perry for stating the charge of "Destruction or Misuse of Property with a Value of $10.00 or More" as "Destruction: Misuse of Property with a Value of $10.00 or More." In other words, they disciplined him for replacing the word "or" with a colon. Officer Bullock, however, testified that she has frequently failed to type the proper name of a charge on the corresponding report, and yet Bullock has never been disciplined for failing to do so.

The prison officials disciplined Perry for re-listing a case to get physical evidence or a photograph of physical evidence that he deemed relevant. Hearing Officer Ann Baerwalde has re-listed cases to get physical evidence or a photograph of physical evidence that she deemed relevant, but has never been disciplined for doing so.

The prison officials disciplined Perry for failing to state in his hearing record that a door is worth more than $10 (when an element of the crime demanded that the property be worth more than $10). Leonard Den Houter, Supervisor of the Office of Policy and Hearings and Perry's direct supervisor, admits that other hearing officers have made the same mistake, but he does not recall disciplining them.

Perry's infractions and those of his colleagues were obviously of "comparable seriousness," as is required under the standard. *Mitchell*, 964 F.2d at 583 n.5. As such, it is abundantly clear that genuine issues of material fact exist as to whether the prison officials treated Perry differently from similarly situated non-minority employees. Consequently, we conclude that the district court erred in finding that Perry did not satisfy prong four of the test.

The court erred as to prong three as well. The prison officials accept that Perry would seem qualified for the job in that he has a law degree and is a member of the Michigan Bar, but they argue that his job performance was poor. In doing so, the prison officials rely almost exclusively on Perry's

distinction between matters of public concern and matters only of personal interest, not civic-minded motives and self-serving motives." *Chappell*, 131 F.3d at 575. Thus, whether Perry's racial discrimination complaint was borne of civic-minded motives or of an individual employment concern is irrelevant. What is relevant is that the subject of Perry's complaint was racial discrimination – a matter inherently of public concern, according to the Supreme Court. *See Connick*, 461 U.S. at 148 n.8.

We find that Perry's complaint of racially disparate treatment, which consisted of an internal grievance, is a matter of public concern, and as such, we remand the issue to the district court for further consideration in line with this opinion.

### IV.  Substantive Due Process

Perry asserts that the district court erred in granting the prison officials' FRCP 12(b)(6) motion to dismiss his substantive due process claim. A substantive due process right may be implicated when a public employee is discharged for reasons that shock the conscience. *See McMaster v. Cabinet for Human Resources*, 824 F.2d 518, 522 (6th Cir. 1987). The violation of a fundamental right, however, is necessary for a successful substantive due process claim. *See Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1350 (6th Cir. 1992). Therefore, the crux of the question is whether the prison officials violated one of Perry's fundamental rights.

Just as the district court found that Perry's right to freedom of expression was not abused, the court found that his right to freedom of expression could not serve as the fundamental right necessary for due process analysis. On that basis, the court dismissed Perry's substantive due process claim. Because Perry's First Amendment claim was incorrectly dismissed, it logically follows that his substantive due process claim based on the First Amendment claim should not have been dismissed – in that the right to freedom of expression should have been viewed as a fundamental right in the substantive due process analysis. As such, the district court's

complaint is, as a matter of law, a matter of public concern. A review of the case law reveals that Perry is correct.

In *Connick*, discussed above, the Supreme Court clearly established that racial discrimination is inherently a matter of public concern. *See Connick*, 461 U.S. at 148 n.8. Furthermore, in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979), the Supreme Court established that an employee's choice to communicate privately with an employer does not strip the concern of its public nature. "Neither the [First] Amendment itself nor our decisions indicate that [freedom of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan*, 439 U.S. at 415-16. Here, it is undisputed that Perry complained about racial discrimination and that he did so in a private conversation with supervisors.

The prison officials, however, argue that although Perry complained of racial discrimination and did not lose his First Amendment protection by communicating privately, Perry's claim is not a matter of public concern. The prison officials rely on *Rice v. Ohio Department of Transportation*, 887 F.2d 716 (6th Cir. 1989), for the proposition that if an employee is not speaking out as a citizen, but is instead advancing his own personal employment dispute, that employee's complaint may not be deemed a matter of public concern. *See Rice,* 887 F.2d at 721. The prison officials note that Perry was complaining in the course of his personal employment dispute, and that the district court, citing *Rice*, decided that Perry's complaint was not a matter of public concern.

The district court, however, made its decision in the instant case on September 11, 1996, over a year before the Sixth Circuit decided *Chappell v. Montgomery County Fire Protection*, 131 F.3d 564 (6th Cir. 1997). *Chappell*, a case in which this Court examined what is a matter of public concern, clears up any confusion resulting from *Connick*, and disposes of the issue. In *Chappell,* this Court plainly states that "[t]he fundamental distinction recognized in *Connick* is the

numerous citations for the alleged substandard disposition of cases during his tenure. The discussion of prong four above, however, is enough to derail the prison officials' argument. From the beginning, Perry has insisted that the citations he received were pretextual. Evidence indicating that Perry was often cited for errors for which other hearing officers were not cited and was cited for omissions that seem trivial,[2] supports Perry's contention. There is, therefore, clearly a genuine issue of material fact regarding Perry's qualifications.

The district court erred in failing to draw inferences in favor of Perry and consequently determining that Perry failed to satisfy prongs three and four of the aforementioned test. This error led the district court to grant summary judgment for the prison officials.

We acknowledge the possibility that the prison officials' disparate treatment of Perry had nothing to do with race. Perhaps, the prison officials were upset that his not-guilty/dismissal rate was so high relative to the norm (discussed *infra).* And perhaps, as the prison officials argue, Perry was not carrying his weight as a hearing officer. On the other hand, it is possible that the prison officials disciplined and ultimately terminated Perry because of the color of his skin. Trials exist to resolve such issues of fact, and summary judgment is to be used only when there is no question as to such issues of fact. Here, many questions are left unresolved. These questions must be resolved at trial.

The grant of summary judgment is reversed and the case is remanded for further consideration.[3]

---

[2] On December 10, 1992, Perry was disciplined for failing to state why a razor blade is dangerous in his report regarding a charge of Possession of Dangerous Contraband.

[3] Claims for race discrimination in violation of the ELCRA, like Fourteenth Amendment equal protection claims, are interpreted in accordance with Title VII of the Civil Rights Act of 1964. *See Kitchen v. Chippewa Valley Sch.*, 825 F.2d 1004, 1012 (6th Cir. 1987). As such, the

### III.  Freedom of Expression

Perry further argues that the district court erred in granting the prison officials' motion to dismiss his §1983 claim for violation of his right to freedom of expression under the First Amendment, made applicable to the states by the Fourteenth Amendment.  We agree.

An FRCP 12(b)(6) motion to dismiss for failure to state a claim may only be granted if it is clear beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984).  In determining how to handle the motion, the court must accept all of the plaintiff's factual allegations as true and must construe the complaint in the light most favorable to the plaintiff. *See Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996).  Further, "this court will scrutinize with special care any dismissal of a complaint filed under a civil rights statute." *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985).  Finally, this Court must review the district court's dismissal *de novo*. *See Cameron v. Seitz*, 38 F.3d 264, 270 (6th Cir. 1994).

In order to have stated a claim under §1983, Perry must have alleged in his complaint that 1) he was deprived of a right secured by the Constitution or laws of the United States and that 2) the deprivation was caused by someone acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

In the instant matter, there is no debate as to the second prong.  The prison officials do not dispute that while working under the authority of the MDOC they were acting under color of state law.  The question is whether Perry was deprived of a right secured by the Constitution.  Perry asserts that he was deprived of his First Amendment right to freedom

discussion in Part II of this opinion is *completely* applicable to the ELCRA claim, and the conclusion is the same – the grant of summary judgment is reversed and the case is remanded.

that he was disciplined and terminated because of the MDOC's interest in ensuring guilty findings for no less than 90% of defendants.  Drawing all inferences in favor of the plaintiff, as is required under FRCP 12(b)(6), would seemingly lead the district court to the conclusion that part of the government's interest – if not its entire interest – in disciplining and terminating Perry was in maintaining a guilty rate of 90%.  As explained above, adherence to a particular guilty rate necessarily results in arbitrary justice for innocent inmates adjudged guilty in the pursuit of this interest.  Insistence upon a 90% guilty rate flies in the face of due process as mandated by *Wolff*, and is thus not a legitimate organizational interest.

At the very least, the record is not thorough enough to determine whether the MDOC's interest in impairing Perry's First Amendment right through discipline and termination was based on a desire to maintain accountability or a desire to maintain a 90% guilty rate.  As such, the district court erred in determining that the *Pickering* balance could only favor the prison officials and in consequently granting the prison officials' motion to dismiss.  Therefore, the issue is remanded to the district court for further consideration in line with this opinion.

### B.

In his complaint, Perry states that while working for the MDOC, he made an internal grievance, asserting that he was being disciplined because of his race, and that he was further disciplined and ultimately terminated, in part, because of those complaints. The *Pickering* test applied in Part III(A) of this opinion governs this analysis as well.  In this instance, however, the district court used the first prong of the test to dispose of the issue – determining at the FRCP 12(b)(6) stage that Perry's complaint of racially disparate treatment, which consisted of an internal grievance, did not constitute a matter of public concern.

On appeal, Perry argues that the court simply misunderstood the governing precedent, and that Perry's

against proceeding to the fact-finding stage of the trial. It erred in doing so.

Moreover, the district court struck the balance in an impermissible manner. Both the Supreme Court in *Rankin* and this Court in *Meyers v. City of Cincinnati*, 934 F.2d 726 (6th Cir. 1991), have outlined the considerations which a court must take into account when utilizing the balancing test. Taking its cue from *Rankin*, this Court wrote:

> In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers. The state bears the burden of showing a legitimate justification for discipline. As in Rankin, we look for evidence of the impact of the statement on the city's *legitimate* organizational interests.

*Meyers*, 934 F.2d at 730 (citations omitted) (emphasis added). MDOC's organizational interest, therefore, must be *legitimate* if the court is to effectuate a meaningful balancing. The district court concluded that the MDOC's interest was legitimate. We disagree.

The district court asserted that "[t]he MDOC has to be able to discipline its hearing officers for findings and credibility determinations made in prison misconduct hearing reports; otherwise all ALEs would be insulated from accountability for any statements made in that context." Thus, the district court determined that the organizational interest at stake was the MDOC's interest in maintaining accountability among hearing officers. We acknowledge that maintaining accountability is a legitimate interest. Whether the government's interest in maintaining accountability led to Perry's disciplining and ultimate termination, however, is far less clear. Perry has produced substantial evidence suggesting that the MDOC implores its hearing officers to find no less than 90% of the defendant's before them guilty, and he insists

of expression in two ways: 1) he suffered retaliatory termination because of his findings made as an ALE in prisoner misconduct hearings; and 2) he suffered retaliatory termination because of his complaints of race discrimination. We will deal with the two in turn.

### A.

### 1.

As a threshold matter, we must determine whether Perry's decisions made in inmate disciplinary hearings constitute expression as protected by the First Amendment. We find that they do. The Supreme Court has long held that communicative action is protected by the First Amendment. *See Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 505-506 (1969) (holding that the act of wearing a black armband constitutes expressive conduct and is protected by the First Amendment); *Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966) (holding that a sit-in by Black students constitutes symbolic speech).

This Circuit has done the same – most notably and relevantly in *Parate v. Isibor*, 868 F.2d 821 (6th Cir. 1989). *Parate* involved an engineering professor at Tennessee State University, Natthu Parate, who refused to alter his evaluation of a student and was subsequently subjected to discipline and threats of termination. Parate assigned the student a "B" while the Dean of Tennessee State's School of Engineering and Technology – whom the Court suggests had a particular affinity for the student involved because of a shared national heritage – insisted that the student receive an "A". When Parate refused, the Dean disciplined Parate and threatened to fire him.

The Court explained that because "the assignment of a letter grade is symbolic communication intended to send a specific message to the student, the individual professor's communicative act" falls within the bounds of the First Amendment. *Parate*, 868 F.2d at 827. The Court then held that the Dean's act of forcing Parate to choose between

changing the grade against his professional judgment and keeping his job "unconstitutionally compelled Parate's speech." *Id.* at 830.

Although *Parate* and the instant case involve different sectors of the state's machinery – an educational institution and a correctional institution – the cases involve nearly identical communicative acts protected by the First Amendment. In the instant case, as in *Parate*, the state entrusted one of its employees with the task of reviewing facts, evaluating a set of circumstances, and making a decision. In *Parate*, the decision was handed down in the form of a letter grade. In the case at bar, the decisions came in the form of guilty/not-guilty determinations. Perry's decisions, like Parate's, are communicative acts – acts aimed squarely at the inmates in question with the goal of reemphasizing the parameters of acceptable behavior in prison.

In *Parate*, this Court decided that the attempt to pervert the communicative acts with discipline and threatened termination was the essence of coerced expression. Such compulsion in the academic realm is certainly of concern. It is, however, particularly unsettling in the instant case because, here, the interference results in the heavy hand of the state's disciplinary authority being brought to bear on inmates who may have done nothing to deserve the invocation of that authority.

We find that a disciplinary hearing decision, like the assignment of a letter grade, is a communicative act entitled to First Amendment protection.

## 2.

A determination that First Amendment-protected expression is involved is, of course, only a preliminary issue in the analysis of a First Amendment retaliatory discharge claim.

or another. Just a couple that I haven't heard ever say that.

If hearing officers focus on finding 90% of the defendants before them guilty, as the evidence adduced thus far suggests, they cannot possibly be impartial, as is required by *Wolff*. The prisoner whose case merits a not-guilty finding, but whose case would result in the eleventh not-guilty finding in one hundred decisions, is sunk. His fate is sealed before his file is opened. Such a system reeks of arbitrary justice, which can only be injustice.

Because Perry's speech served to ensure that the MDOC, an arm of the state, was operating in accordance with the law as established in *Wolff*, it concerns the most public of matters.

### b.

As noted above, the district court surpassed prong one of the *Pickering* test altogether, and based its disposition of the case on prong two, concluding that the MDOC's interest in disciplining ALEs outweighed Perry's right to speak on a matter of public concern. In concluding as such, the court erred.

In many cases, due to inadequate factual development, the prong two balancing test "cannot be performed on a 12(b)(6) motion." *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 (9th Cir. 1997). This is such a case. Because the facts were not well enough developed in the pleadings, the court should not have performed the test. The court, however, performed the test by going beyond the pleadings and engaging in fact finding, which is impermissible at the FRCP 12(b)(6) stage. Reaching beyond the pleadings, the court determined that the MDOC's interests outweighed Perry's rights. The court based its decision on the proposition that the MDOC must be able to discipline its hearing officers for their decisions in order to prevent all ALEs from being insulated from accountability. Nothing in the pleadings could have led the court to such a conclusion. Such a conclusion required the finding of facts. The district court, however, decided

It is well established that a government employer cannot "condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). As a logical consequence, retaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation. *See Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994). This is the case even if the employee could have been terminated for any reason. *See Rankin v. McPherson*, 483 U.S. 378, 383 (1987).

The Supreme Court has established a three-pronged test for determining whether a plaintiff can prevail on a First Amendment retaliatory discharge claim. Under the test, commonly called the *Pickering* test, the plaintiff must set forth three elements: 1) the speech involved a matter of public concern, *see Connick*, 461 U.S. at 143; 2) the interest of the employee "as a citizen, in commenting upon matters of public concern," outweighs the employer's interest "in promoting the efficiency of the public services it performs through its employees," *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968); and 3) the speech was a substantial or motivating factor in the denial of the benefit that was sought. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the employee satisfies this test, he has established a *prima facie* case.[4]

Here, Perry argues that he was fair and impartial in his disposition of disciplinary cases, and that each of his decisions was a communicative act protected by the First Amendment. He further argues that in disciplining and terminating him for that expression, the MDOC infringed upon his freedom of expression. Perry presents the following facts in support of his assertion.

---

[4]Because prong three of the *Pickering* test involves a determination of fact, normally reserved for a jury or the court in its fact-finding role, *see Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994), the district court rightfully did not reach it.

Here, Perry asserts that pursuant to the Supreme Court's mandate in *Wolff*, he acted non-arbitrarily and as an impartial and independent fact finder. He further asserts that through his disciplinary hearing decisions, made with an eye toward justice and impartiality, he was ensuring – at least to the extent of the cases for which he was responsible – that the MDOC was operating in accordance with the law as established by *Wolff*.

Perry alleges that the MDOC, however, was contravening the law by demanding that ALEs find 90% of inmates appearing before them guilty. Van Ochten denies that she or any of the hearing officers under her supervision (of whom Perry was one) were ever formally limited to a particular not-guilty/dismissal rate. Regardless of whether she and her hearing officers were beholden to a formal regulation demanding a certain not-guilty/dismissal rate, overwhelming evidence suggests that there was, *at the very least*, a strong expectation that the not-guilty/dismissal rate should not rise above 10%. In her own deposition, Van Ochten admits that Deputy Director Bolden of the Correctional Facilities Administration decided "that if the not-guilty/dismissal rate at a facility went above a certain percentage, that he was going to view that as a trouble signal." The critical rate was 20% in the early 1980's, but Bolden reduced it to 10% in the early 1990's, noting that he "thought [the MDOC] should be doing better." Van Ochten concedes that the rate was discussed at meetings and that, when not-guilty/dismissal rates got high, there was pressure "put on wardens to bring those rates down." Further still, at trial, Hearing Officer Arvid Perrin testified specifically about the ubiquity of that coercion when asked to recite the names of every hearing officer who complained about the pressure to find inmates guilty:

I've heard complaints from Hearing Officers about times they were criticized for finding somebody not guilty or dismissing a case. . . . I think the exception would be, you know, easier. . . . [P]eople I have seen and talked to, I would say just about all of them I had heard at one time

The MDOC conducts probationary evaluations of all new ALEs after three months on the job and again after six months.   Perry received satisfactory ratings at both probationary evaluations and continued to receive good reviews for the first year-and-a-half of his tenure.  On March 8, 1990, Perry received his first citation from his direct supervisor, Den Houter, regarding a problem with his disposition of a case.   During the twenty-seven months between Den Houter's original complaint about Perry's work and June 22, 1992, Perry received only four additional citations regarding his disposition of cases.  The rate at which Perry disposed of cases through finding inmates not-guilty and issuing dismissals, however, was higher than the norm.  Perry's not-guilty/dismissal rate hovered between 17% and 18%, which was well above the institutional standard of 10%.  When Perry's supervisors noticed his not-guilty/dismissal rate, the frequency with which they cited him for substandard disposition of cases increased dramatically.

On June 18, 1992, Den Houter wrote a memorandum to Marjorie Van Ochten, the Administrator of the Office of Policy and Hearings and Den Houter's direct supervisor, noting that pursuant to her request he had reviewed all of Perry's not guilty and dismissed hearing reports, and found that Perry was prone to finding prisoners not guilty.  Beginning on June 22, 1992, four days after Den Houter's memorandum to Van Ochten, Perry received the first of *nineteen* memoranda that he would receive over the course of the following *sixteen* months citing him for mistakes in his disposition of cases.   As noted above, Perry's colleagues made many of the same mistakes, but were not cited.  Perry was terminated two weeks after receiving the last of those nineteen memoranda.

**a.**

The district court assumed, *arguendo*, that Perry's decisions in inmate disciplinary hearings constituted matters of public concern, and then proceeded to base its disposition of the case on prong two of the *Pickering* test – the balancing prong.

When fleshed out, it is clear that Perry's insistence through his decisions that he be impartial and operate within the confines of constitutional law, constitutes speech on a matter of public concern. When Perry conducts hearings, he is doing so at the behest of the Michigan legislature, *see Mich. Comp. Laws* § 791.252 (1979),  and is making decisions that can result in a greater or lesser period of incarceration for an inmate.  These are intensely public matters.

Furthermore, the public undoubtedly has an interest in a public employee's efforts to remain undeterred by a public employer's policy that seeks to limit constitutionally mandated fairness in inmate disciplinary hearings. *See Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986).  In *Marohnic*, a case in which this Court examined what constitutes a matter of public concern, the Court concluded that "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Id.*

Public interest is certainly near its zenith here.  In 1974, in the case of *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Supreme Court mandated the establishment of prison disciplinary hearings, demanding that inmates be afforded due process before being disciplined for major misconduct. The Court acknowledged that "the full panoply of rights due a defendant [in a criminal prosecution] does not apply" with regard to inmate disciplinary hearings, and that the contours of the due process guaranteed an inmate depends to some extent on context. *Id.* at 556.  The Court clearly articulated, however, that due process can only be finessed so much before it ceases to be due process.  "The touchstone of due process is protection of the individual against arbitrary action of government." *Id.* at 558.[5]

---

[5]The state of Michigan is just as resolute in its prohibition of arbitrary or impartial decision making in prison disciplinary cases. *See Mich. Comp. Laws* § 791.252(i) (1979).