**Violet SERRATO, Plaintiff**

v.

**BOWLING GREEN STATE UNIVERSITY, et al., Defendants**

**No. 3:01–CV–7619.**

United States District Court, N.D. Ohio, Western Division.

March 24, 2003.

Thomas A. Sobecki, Toledo, OH, for Violet Serrato, Plaintiff.

Janine T. Avila, Connelly, Jackson & Collier, Tammy Geiger Lavalette, Connelly, Jackson & Collier, Toledo, OH, for Bowling Green State University, Joshua Kaplan, in his individual and official capacity, Bowling Green State University Student Health Service, Marlene Reynolds, in her individual and official capacity, Bowling Green State University Student Health Service, Joanne Navin, in her individual and official capacity, Bowling Green State University Student Health Service, Bryan Benner, in his individual and official capacity, Bowling Green State University Associate Vice President for Administration, Defendants.

## ORDER

CARR, District Judge.

Plaintiff Violet Serrato brings this action against defendants Bowling Green State University ("BGSU"), and BGSU employees Joshua Kaplan, Marlene Reynolds, Joanne Navin, and Bryan Benner in their individual and official capacities, asserting a claim under 42 U.S.C. § 1983 for retaliation in violation of the First and Fourteenth Amendment. This court has jurisdiction pursuant to 28 U.S.C. § 1331. This court dismissed the claims against BGSU and the four individual defendants in their official capacities. Pending is a motion for summary judgment brought by Kaplan, Reynolds, Navin, and Benner in their individual capacities. For the following reasons, defendants' motion shall be granted.

## BACKGROUND

In August, 1990, BGSU hired plaintiff as a part-time clerk at BGSU's Student Health Services ("SHS"). By early 1995, plaintiff was a permanent full-time nine-month clerical specialist and worked at SHS's front desk. A full-time twelve-month clerical specialist position became available, and both plaintiff and fellow SHS clerical specialist Cheryl Schick applied for the vacancy.

On February 8–9, 1995, Schick reportedly told several other SHS employees that she "was very angry about [plaintiff] applying for a job that she also was applying for, and that she had made remarks that if she didn't get the job, that there were going to be a lot more openings at the front desk area, and that she was going to bring a gun in and kill her." (Pl. Depo. vol. 1 at 30–31). Schick reportedly did not use plaintiff's name. Plaintiff did not see or hear Schick make any of the statements. The employees who heard the statements told plaintiff about them on February 9, 1995. Plaintiff believed the threats were directed at herself, because plaintiff and Schick were the only employees applying for the job.

The employees who heard Schick make the statements also reported them to the SHS Medical Director, defendant Joshua Kaplan, on February 9, 1995. Kaplan was not plaintiff's direct supervisor, but was in her supervisory chain of command.

When he learned about Schick's statements, Kaplan contacted the campus police chief, the staff clinical psychologist, and BGSU Vice President Ed Whipple. Kaplan called Schick into his office to talk about the statements. She admitted making them, but said she did not have a gun and did not mean what she said. Kaplan told her that he had reported her to the police. Schick left for the day. Kaplan then told plaintiff and her clerical supervisor, Sherry Beeker, that he had contacted security, that he did not believe Schick meant the threat, and that no action would be taken against Schick. Plaintiff told defendant Kaplan that she was concerned for her safety, and Kaplan advised her to call campus security herself.

The next day, February 10, 1995, Beeker and plaintiff contacted campus security

about Schick's threats. Campus security told them to contact BGSU Human Resources. Plaintiff alleges that Kaplan was angry when he found out she had contacted Human Resources, and alleges that is when the retaliation began. Kaplan then called Human Resources, which advised him to place Schick on administrative leave, with pay, effective immediately. He did so.

On February 13, 1995, plaintiff, Beeker, and two other employees prepared and signed a memorandum to Kaplan expressing safety concerns. That week, the four also met with the campus police chief, who told them they had no grounds to file charges against Schick. During the same week, the director of BGSU Human Resources, John Moore, visited the office and spoke to the employees, including plaintiff. Moore told them that Schick would be placed on administrative leave with pay while she sought counseling, and then she would be suspended without pay for three weeks. Schick only would be allowed to return to work if her counseling reports were favorable.

Plaintiff says Kaplan told SHS employees that Schick would return to work at the front desk. She alleges that Kaplan told her that if she did not like his way of handling the situation, she could find employment elsewhere. Plaintiff says she brought up her safety concerns with Kaplan a number of times during the next two weeks. Kaplan did not have the authority to transfer Schick out of SHS, but when Schick returned to work, she began working on a different floor of SHS instead of at the front desk. Plaintiff, meanwhile, got the job for which she and Schick had applied, and became a permanent twelve-month employee on March 6, 1995.

In the Spring of 1995, plaintiff told Kaplan that she "was concerned Cheryl may be getting 'upset' again since summer was approaching and she would not be work-

ing." (Pl. Depo. vol. II exh. B at 2). Kaplan told her not to worry. Schick visited plaintiff's floor one day in July, 1995, to speak to another employee, and plaintiff asked Kaplan to keep Schick away from plaintiff's work area. Kaplan refused the request. Plaintiff alleges that in October, 1995, Schick again visited plaintiff's floor to make copies and bumped plaintiff with her shoulder while they were in a narrow passageway together. Kaplan then told Schick to stop visiting plaintiff's floor, even to make copies. Since then, Schick has not spoken inappropriately to plaintiff or about plaintiff, and has not offensively touched her. Plaintiff's concerns, however, continued.

In 1997, defendant Navin, SHS Associate Director, replaced Beeker as plaintiff's supervisor. Kaplan was Navin's supervisor. Plaintiff told Navin her safety concerns about Schick. Plaintiff alleges that Navin ignored her concerns, telling her to go back to work, and that the nurses Navin supervised at SHS started to dislike her. In late 1998, defendant Reynolds, SHS Office Manager, replaced Navin as plaintiff's supervisor. Navin supervised Reynolds, and Kaplan continued to supervise Navin. Plaintiff told Reynolds her concerns about Schick and her concerns about perceived retaliatory treatment. Plaintiff alleges Reynolds and Kaplan stopped talking to her. Plaintiff alleges that Kaplan told his own supervisor, Tonia Stewart, that he believed plaintiff was crazy, and that he did not think Schick's threats had been serious.

Defendant Benner never was plaintiff's supervisor, but was scheduled to be deposed in a separate lawsuit plaintiff had filed. He learned of plaintiff's complaints about Schick while serving as BGSU's interim Human Resources Director from approximately April 1996 to 1997, and he was BGSU's Associate Vice President for Ad-

ministration as of May 7, 2001. Plaintiff alleges that on that day, as she was about to cross a street, a car swerved towards her. She says Benner was a passenger in the car, and that she saw him laughing. She asserts that he must have told the driver of the car to swerve toward her as retaliation for deposing him. Plaintiff also alleges that Benner supported Kaplan in her grievances, and that this constituted retaliation.

Plaintiff alleges that as a result of "harassment, belittlement, and marginalization," she developed medical problems that forced her to leave SHS in 2000. (Doc. 48 at 2). She alleges that in late 1996, she had surgery and then wanted to return to work part-time; Kaplan would not let her do so until she complained to other university officials. She also alleges that Kaplan fired the student workers she supervised, and would not provide her with a written job description. She alleges that her supervisors gave her poor evaluations in retaliation. Also, between 1996 and 2000, plaintiff filed numerous grievances for perceived retaliatory treatment, contested her performance evaluations, and appealed various decisions.

Plaintiff sued BGSU and the four individual defendants in their individual and official capacities. On February 28, 2002, this court granted defendants' motion to dismiss BGSU and the individual defendants in their official capacities, leaving only plaintiff's claims against the individual defendants in their individual capacities. The four defendants, in their individual capacities, have moved for summary judgment.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## DISCUSSION

Plaintiff claims that defendants retaliated against her for speech protected by the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

For plaintiff to establish a claim of First Amendment retaliation, she must demonstrate: 1) she was engaged in a constitutionally protected activity; 2) the defendants' adverse action caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and 3) the adverse action was motivated at least in part as a response to the exercise of her constitutional rights. *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001); *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir.2000). If the plaintiff can establish the three elements, the burden of persuasion shifts to the defendants, who must show, by a preponderance of the evidence, that they would have taken the same action even in the absence of the protected conduct. *Leary*, 228 F.3d at 737 (quotation omitted).

To demonstrate that she was engaging in constitutionally protected speech, plaintiff must show: 1) her speech touched on matters of public concern; and 2) her "interest in commenting on matters of public concern ... outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Cockrel*, 270 F.3d at 1048 (citations omitted).

### 1. Matter of Public Concern

In *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court held that matters of public concern are those that can "be fairly considered as relating to any matter of political, social, or other concern to the community[.]" The initial inquiry into determining whether a public employee's speech is a matter of public concern is a question of law. *Rankin v. McPherson*, 483 U.S. 378, 386 n. 9, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684.

In *Connick*, a public employee was discharged after circulating a questionnaire within her office, asking questions about employees' confidence and trust in their supervisors, the level of office morale, and the need for a grievance committee. The Court noted that the employee did not intend to inform the public that her office was not fulfilling its responsibilities, and did not seek to reveal actual or potential wrongdoing within the office or breach of the public trust; "[i]ndeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." 461 U.S. at 148, 103 S.Ct. 1684.

The Court held:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 147, 103 S.Ct. 1684.

The Sixth Circuit, in construing this language in *Connick*, has held that the "key question is not whether a person is speaking in his role as an employee or a citizen, but whether the employee's speech in fact touches on matters of public concern."

*Cockrel,* 270 F.3d at 1052. The court continued:

> Thus, even if a public employee were acting out of a private motive with no intent to air her speech publicly, as was the case with [plaintiff] Myers, so long as the speech relates to matters of 'political, social, or other concern to the community,' as opposed to matters 'only of personal interest,' it shall be considered as touching upon matters of public concern.

*Id.* (citing *Connick,* 461 U.S. at 146–49, 103 S.Ct. 1684).

■ Consequently, it is irrelevant to this case that plaintiff arguably had a personal motive—her personal safety—in her speech. In *Chappel v. Montgomery County Fire Prot.,* 131 F.3d 564 (6th Cir.1997), the court held that "the argument that an individual's *personal* motives for speaking may dispositively determine whether that individual's speech addresses a matter of *public* concern is plainly illogical and contrary to the broader purposes of the First Amendment." 131 F.3d at 574.

> Whether an employee's statement is predominated by 'the employee's personal interest *qua* employee' is primarily a content-based inquiry, not an exclusively motive-based inquiry. The fundamental distinction recognized in *Connick* is the distinction between matters of public concern and matters only of personal interest, not civic-minded motives and self-serving motives.

*Chappel,* 131 F.3d at 575 (citation omitted); *see also Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 585 (6th Cir.2000) (same); *Perry v. McGinnis,* 209 F.3d 597, 608–09 (6th Cir.2000) (same). What is relevant is the subject of plaintiff's complaint. *Id.* at 609.

It also is irrelevant to this case that plaintiff privately expressed her concerns to other university employees, instead of in a public forum. An employee may arrange to communicate privately with his or her employer; this does not transform a matter of public concern into a matter of private concern. *Givhan v. W. Line Consol. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Perry,* 209 F.3d at 608.

The subject of plaintiff's speech was an internal employee dispute. An internal employee grievance is the quintessential example of a matter of private concern. *See, i.e., Connick,* 461 U.S. at 148, 103 S.Ct. 1684 (questions on internal office questionnaire about office morale and relationships with supervisors did not touch on matters of public concern); *Cockrel,* 270 F.3d at 1052 ("an employee grievance or some other private dispute" generally does not constitute a matter of public concern); *Lancaster v. Indep. Sch. Dist. No. 5,* 149 F.3d 1228, 1234 (10th Cir.1998) (employee made public statements about his formal reprimand; court held that where "plaintiff's grievances relate to an internal personnel dispute, then the content is only of private concern."); *see also United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (unprotected speech includes "speech that involves nothing more than a complaint about a change in the employee's own duties [which] may give rise to discipline without imposing any special burden of justification on the government employer.").

Conversely, courts have found that employees' speech touches on matters of public concern where the statements relate to matters of wide political interest. *See, i.e., Cockrel,* 270 F.3d at 1051 (employee's speech about the benefits of industrial hemp touched on matter of public concern); *Leary,* 228 F.3d at 737 (teachers' statements about student discipline and appropriate educational programs touched on matters of public concern); *Johnson,*

215 F.3d at 585 (employee's statements on the employer's failure to comply with its affirmative action program touched on matter of public concern); *Meyers v. City of Cincinnati*, 934 F.2d 726, 730 (6th Cir. 1991) (speech about politically charged issue touched on matter of public concern).

The balance between matters of public concern and matters of private concern was illustrated in *Black v. Columbus Pub. Sch.*, 124 F.Supp.2d 550 (S.D.Ohio 2000). Plaintiff, a school employee, claimed retaliation for her allegations that the principal of her school was having an affair with a parent volunteer. While allegations of sexual misconduct at a middle school arguably could be of public concern, 124 F.Supp.2d at 581, the district court found that plaintiff's speech did not touch on matters of public concern, because, in context, it was motivated by personal concerns, "not based on a desire to alleviate a matter of public concern," and focused on how the misconduct affected her own job duties. *Id.*

■ Taking the plaintiff's statements in the context in which they were made, it is plain that they did not relate to a matter of public concern. Plaintiff argues that because SHS was a university office, visited by students and other members of the public, threats of violence at the office constituted a matter of public concern. The Sixth Circuit has held that matters of public safety, generally, are "near [the] zenith" of public concern. *Chappel*, 131 F.3d at 578. Public safety, however, was not at issue when plaintiff spoke. If plaintiff had alleged that she was the victim of retaliation for informing Kaplan of the threat on February 9, 1995, she might have been able to argue that this statement touched on a matter of public concern. Plaintiff did not talk to Kaplan on February 9, however, until Kaplan had called security, ascertained that Schick's threat was not serious, and sent Schick home. Plaintiff's telephone call to campus security on February 10, 1995, arguably could have touched on a matter of public concern, because Schick was back in the office that morning. Plaintiff does not, in any event, allege retaliation for her February 9, 1995, statement of concern to Kaplan or for her February 10, 1995, call to security.

Instead, plaintiff alleges that the retaliation against her began when she contacted Human Resources to complain about Schick on February 10, 1995. When plaintiff called Human Resources, she could not have had the purpose of protecting herself or the public, nor could a call to Human Resources have had that effect. Taking plaintiff's statements in context, plaintiff's call to Human Resources was not regarding a matter of public concern, but instead regarding the internal disciplinary decisions of her superiors.

Any public interest in plaintiff's speech ceased after her superiors took action to avert the threat Schick may have posed. In all of her subsequent statements to Kaplan, Navin, and Reynolds, plaintiff only alleges that she disagreed with Schick's punishment. Because internal employee disciplinary matters are not of public concern, plaintiff's statements of disagreement did not touch on a matter of public concern.

The record shows that Schick's supervisors, BGSU Human Resources, BGSU security officers, and a counselor agreed that Schick did not present a threat to plaintiff or anyone else after Schick's suspension, counseling, and transfer. Properly construed, plaintiff's statements were merely statements of disagreement with the disciplinary action BGSU officials took against Schick for making the threat. Tellingly, plaintiff has not alleged that she sought any other remedy to alleviate the danger

she perceived, except further disciplinary action against Schick.

For example, the February 13, 1995, letter to Kaplan from plaintiff and three other SHS employees reads, in pertinent part:

> Action should have been taken immediately to remove [Schick] from the SHS to alleviate anxiety which many employees felt over this. Really it is our opinion that when these comments were brought to your attention and then confirmed by other staff, removal, transfer or other action should have been immediate and swift.... We as employees under your supervision want you to take her threats against people serious and *follow through with disciplinary action.*

(Def.Exh. C) (emphasis added). On the date this letter was written, Schick already had been placed on leave.

Plaintiff alleges that on August 17, 1995, she approached Kaplan and "explained to him in great detail how I felt this matter was not handled properly and the main concern had been more toward keeping bad [public relations] from getting out than the safety of the employees[.]" (Pl. Depo. vol. II exh. B p. 2). This statement seems to accuse him of mishandling Schick's threats, an accusation that arguably could concern the public. However, read in context, as it must be read, the statement expressed private concerns. Plaintiff continues:

> Dr. Kaplan informed me Cheryl Schick would be returning upstairs [at SHS] on August 28 for thirty days and then she would be put in a pool where she could bump another Clerical Specialist with less seniority. He said if I did not feel safe working there then I should quit my job. Dr. Kaplan also told me that Cheryl's psychological reports were all favorable and she was cleared to return to work by her psychologist. He also said he was not comfortable with Cheryl

returning and he had tried to get her out of the area, but the decision had been [made by the Vice President for Student Affairs].

*Id.* at 2–3. In context, plaintiff's statement expressed nothing more than disagreement about Schick's continued employment at BGSU.

Later, plaintiff's speech expanded to include allegations of retaliation, but because the plaintiff has failed to allege these statements with any specificity, it is impossible to evaluate whether they, too, arguably may have touched on matters of public concern. A fair reading of the record, however, does not support any inference that plaintiff's allegations of retaliation touched on matters of public concern. In all of plaintiff's written and oral communications with defendants, she appears to have been pursuing a personal interest: namely, a desire to see Schick fired.

### 2. Balance of Interests

Even if any of plaintiff's speech touched on a matter of public concern, it was not constitutionally protected. If "any part of an employee's speech, ... relates to matters of public concern, the court must conduct a balancing of interests test as set forth in *Pickering* [.]" *Rahn v. Drake Ctr., Inc.,* 31 F.3d 407, 411 (6th Cir.1994). Under *Pickering,* none of plaintiff's speech was constitutionally protected unless her interest in speaking outweighed "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. The court should consider the content, form, and context of the statements in making this determination. *Speers v. University of Akron,* 189 F.Supp.2d 759, 771 (N.D.Ohio 2002).

The Sixth Circuit has stated that in applying the *Pickering* balance-of-interests test, a court should "consider whether an

employee's comments meaningfully interfere with performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among coworkers, *impair discipline by superiors,* or destroy the relationship of loyalty and trust required of confidential employees." *Cockrel,* 270 F.3d at 1053 (citations omitted) (emphasis added).

Plaintiff's comments were intended to "impair discipline by superiors." *Id.* She disagreed with the disciplinary sanctions imposed against Schick, and urged her superiors to take stronger measures. Even if internal employee disciplinary sanctions constituted matters of public interest, plaintiff's interest in expressing her disagreement with Schick's punishment is not as strong in the university's interest in enforcing its chosen disciplinary sanctions against Schick, free from the unsolicited advice of Schick's co-workers. For the university, the "efficiency of the public services it performs through its employees" depends, in part, upon the ability of its supervisors to resolve internal employee disputes, and that efficiency is undermined when employees repeatedly question their decisions. In *Connick,* the Court stated that "government offices could not function if every employment decision became a constitutional matter." 461 U.S. at 143, 103 S.Ct. 1684. The evidence in this case shows that the SHS was beset with numerous personnel problems as a result of plaintiff's grievances and accusations, and that these problems impaired the office's operations.

The plaintiff's questionnaire in *Connick,* with the exception of one question, was intended "to gather ammunition for another round of controversy with her superiors." 461 U.S. at 148, 103 S.Ct. 1684. In this case, the evidence shows that plaintiff had a similar intent. As the Court stated in *Connick,* the publication of plaintiff's questionnaire only would show that a "single employee is upset with the status quo." 461 U.S. at 148, 103 S.Ct. 1684. The airing of plaintiff's grievances in this case show exactly that, as well. An employer is not required to "tolerate action which he reasonably believe[s] would ... undermine his authority[.]" *Connick,* 461 U.S. at 154, 103 S.Ct. 1684. By refusing to accept the decision of Kaplan and Human Resources to suspend and transfer Schick, plaintiff undermined the authority of her superiors.

In sum, plaintiff has not alleged retaliation for alerting anyone of danger, only for her independent attempts to influence the university's decision about Schick's disciplinary sanctions. Consequently, I find that plaintiff has alleged retaliation for making statements: 1) that did not relate to matters of public interest; and 2) in which her interest was outweighed by the interests of her superiors. Because those statements fail both parts of the test for determining constitutional protection, the motion for summary judgment on plaintiff's § 1983 claim for retaliation must be granted.[1] This court need not consider whether the alleged campaign of harassment against plaintiff constituted adverse action, or whether any such harassment was caused by plaintiff's statements, because plaintiff did not engage in constitutionally protected activity.

---

1. Though plaintiff does not clearly state it, the record shows that plaintiff's claim against Benner also alleges retaliation for plaintiff's deposition of him in a separate lawsuit. Even assuming that deposing Benner was constitutionally protected activity, however, plaintiff's bare allegation that Benner told a driver to swerve at her is not enough to defeat his motion for summary judgment. Plaintiff has produced only her own speculative assertions, rather than proof that Benner told the driver to strike her. Consequently, she cannot show the elements of adverse action and causation.

## CONCLUSION

Because plaintiff has not presented evidence from which a reasonable jury could conclude that her statements touched on matters of public interest and outweighed the interests of defendants in the efficient operation of SHS, she has failed to demonstrate that she engaged in constitutionally protected activity. Because her § 1983 claim depends on such a showing, plaintiff cannot prevail, and summary judgment must be granted. Summary judgment also must be granted on plaintiff's retaliation claim against Benner, because she has failed to produce any proof that the alleged swerving incident occurred.

**It is, accordingly, ordered that:**

1) Defendants' motion for summary judgment be, and the same hereby is, granted.

**So ordered.**