NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0112n.06

Case No. 19-3264

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

GLENDA PRADO,                                          )
                                                       )
    Plaintiff-Appellant,                           )
                                                       )
v.                                                     )
                                                       )
JEFFREY THOMAS et al.,                                 )
                                                       )
    Defendant-Appellee.                            )
                                                       )

**FILED**
Feb 20, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

**OPINION**

BEFORE: McKEAGUE, BUSH, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. After a night of dancing but no drinking, Plaintiff Glenda Prado was arrested and detained for suspicion of operating a vehicle under the influence. Those charges were eventually dropped. But Prado alleged that law enforcement had singled her out and mistreated her during the night. So she sued Deputy Sheriff Jeffrey Thomas and other Defendants alleging that they violated her equal protection and due process rights. And she brought civil conspiracy and failure to train or supervise claims. She sought damages for all alleged violations. Following discovery, the district court granted Defendants summary judgment. We AFFIRM.

**I.**

Glenda Prado is a Legal Permanent Resident of the United States. She came to this country from Ecuador and still speaks with a thick Spanish accent. She characterizes herself as having "long, black wavy hair and Latin features." (Appellant's Br. at 4.)

After a late night of Latin dancing, Prado stopped at a Circle K to pick up some refreshments. Her friend from Ecuador stayed in the car. While inside, Prado noticed Deputy Sheriff Jeffrey Thomas and another white man paying. She observed Thomas looking at her and his gaze made her uncomfortable. So she bought a water and a Sprite and left the store.

Prado drove away from the Circle K. Thomas followed Prado's car for about five minutes before stopping her. Once stopped, Thomas let Prado know he stopped her for three reasons: (1) her trunk was open, (2) she was allegedly driving well under the speed limit (35 miles per hour in a 55-miles-per-hour zone), and (3) she allegedly used her turn signal while exiting her parking space. Prado explained that she only slowed for the traffic light.[1] But she conceded her trunk was open. She told Thomas that her daughter likely retrieved chicken feed from the trunk earlier that day and had not closed it correctly.

Thomas shined his light in Prado's eyes and observed they were bloodshot, which Prado also conceded. (R. 56, Prado Dep., PageID 533 (explaining that she told Thomas "yeah" in response to his observation that Prado's eyes appeared bloodshot and explaining that "it's almost 2:00 in the morning, . . . [she] has [] high blood pressure[,] and didn't sleep").) And he requested Prado's license, registration, and proof of insurance. Because he noticed that some of Prado's documents had expired, Thomas returned to his cruiser to gather more information. On his way back to his cruiser, Thomas lifted Prado's trunk open wider before closing it for her.

---

[1] On appeal, she claims that she clearly rejected Thomas's description of her driving speed. In the lower court proceedings and in her arrest video, however, Prado does not explicitly reject the fact that she drove at 35 miles per hour. In fact, she accepts that she drove that slowly in her deposition but explains that she only slowed down for the traffic light. (*Compare* R. 59, Ex. 33, Video # 27,388 at 1:07 AM (asking "I was 35 here?" and explaining "I was waiting for the light to change") *and* R. 56, Prado Dep., PageID 533 (testifying that she told an officer "*yeah*" when the officer let her know she drove well below the speed limit (emphasis added)) *with* Appellant's Br. at 5 (asserting that she told Thomas "clearly that she wasn't going 35 mph").)

After Thomas's trip to his cruiser, he returned to Prado's window and asked her if she had used any illegal drugs that night. In response, Prado requested Thomas administer a blood test to confirm that she neither drank nor used any drugs that evening. So Thomas administered the first Horizontal Gaze Nystagmus test (HGN) while Prado remained seated with her car door closed.

Thomas then asked Prado to exit her car. He asked her for the second time if she had anything to drink that night. Prado again responded no. At that point, Prado also acknowledged she had used her turn signal when backing out. But she continued to assert that she had nothing to drink and that her husband, an attorney, wanted her home.

After that, Thomas returned to his cruiser to make a couple phone calls and to wait for backup. Prado remained standing at the back of her car at Thomas's request. After making his calls, Thomas asked Prado for a third time if she used any illegal drugs or was intoxicated. Again, she told him no. So Thomas administered the second HGN.

During the second HGN, Defendant Deputy Sheriff Sean Kessel arrived as Thomas's backup. Thomas administered the rest of the Standardized Field Sobriety Test (SFST) with Kessel present. Thomas asked and Prado agreed to remove her shoes for the rest of the test. Thomas then asked Prado to "walk [] front and back, front and back" and he "ma[de] [her] stand on one foot" while she "count[ed][.]" (R. 56, Prado Dep., PageID 528.)

Prado struggled to understand Thomas's instructions for the rest of the SFST because English is Prado's third language. So Prado repeatedly asked Thomas clarifying questions during the test. In response, Thomas kept repeating himself. Prado put her foot down during part of the SFST. She explained she did so because she did not understand the test required her to count out loud. Under oath, Thomas swore he observed Prado unsteady on her feet, swaying, using her arms for balance, making incorrect turns, and taking an incorrect number of steps. And in the video

3

Prado wobbles and almost falls during her execution of the SFST. (*E.g.*, R. 59, Ex. 33, Video # 27,388 at 1:20:37 AM.)

Thomas arrested Prado. He let her know that he suspected her of Operating a Vehicle While Under the Influence (OVI). Thomas and Kessel then advised Prado of her Miranda rights. They then placed Prado—handcuffed and still barefoot—in Thomas's cruiser. Kessel brought Thomas Prado's purse and her shoes. And Thomas drove Prado to the Greene County Jail. Kessel remained behind with Prado's car and Prado's Ecuadorian friend because the friend did not have a United States license and could not drive the car.

According to Prado, when Thomas and Prado arrived at the jail, Thomas "dragged" her "barefoot" from his cruiser to the jail.[2] (R. 56, Prado Dep., PageID 536.) Once inside, Thomas turned Prado over to Defendant Deputy Sheriff Donna Fallis. He told Fallis to "book" Prado. (*Id.*) As part of the booking process, Fallis asked Prado to "spread [her] legs" and patted Prado down to "look[] for weapons in [Prado's] clothing and on [her] body[.]" (*Id.* at 539.) Fallis also instructed Prado: "if [you] ha[ve] needles in [your] extensions or . . . [your] hair[,]" Prado should take them out. (*Id.* at 537.) Prado let Fallis know Prado does not wear extensions. (*Id.*) But Fallis searched Prado's hair anyway.[3]

After the search, Thomas requested Prado supply urine for a urine test. As part of the test, Thomas showed Prado the seal enclosing the sample tube so Prado could see that nobody had

---

[2] Under oath, Thomas swore he merely "walked her into the booking area." (R. 57-1, Thomas Aff., PageID 638.)

[3] Prado could not recall if Fallis "sa[id] we're checking to make sure there are no needles or something along those lines" before Fallis checked Prado's hair for them or if Fallis assumed Prado had needles and extensions in her hair even after Prado let Fallis know Prado did not wear hair extensions. (R. 56, Prado Dep., PageID 538–39.)

tampered with the tube beforehand. Fallis then accompanied Prado to the bathroom while Prado provided urine.[4]

Thomas also requested Prado sign a form identifying the urine in the tube as Prado's. Prado refused. She explained that she would not sign until the officers sealed and labeled the closed tube. She later testified that she had "done those tests" during her time working as a caseworker. (*Id.* at 542.) In her experience, the test administrator must place a label across the tube's cover and allow the sample provider to sign the label. Because the officers did not follow those steps, Prado refused to sign Thomas's forms.

Prado's refusal to sign angered Thomas. He told her that she should "n[o]t tell [him] how to do [his] job." (*Id.* at 542.) He took Prado's refusal to sign as a "refusal to submit to a urine test[.]" (R. 57-1, Summ. J. Mot., Thomas Aff., PageID 638.) So he filled out a report documenting Prado's refusal to submit a urine sample. He also threw Prado's urine sample and her driver's license in the trash. And he told Fallis to "throw [Prado] in the hole[.]" (R. 56, Prado Dep., PageID 542.)

Before placing Prado "in the hole," Fallis asked Prado to take a cold shower and change into a jail uniform. According to Prado, Fallis apologized because the officers did not have a towel for Prado. Instead, Prado testified that Fallis gave Prado a "mop" that "was . . . [once] a towel, full of poop, dirty" to dry off with.[5] (*Id.* at 545.) But Prado refused to touch the offered "mop." Fallis then "dressed [Prado] in jail clothing" and the jail's "clunky" shoes. (*Id.*)

---

[4] Prado notes that the officers did not give her any toilet paper to "dry . . . off" with after she provided the sample. (R. 56, Prado Dep., PageID 541.)

[5] Fallis contests this re-telling. In her affidavit, Fallis explained that she did not give Prado "a towel containing dirt or feces to dry herself" off with after the shower. (R. 57-2, Summ. J. Mot., Fallis Aff., PageID 718.) Instead, "[c]onsistent with the policy and procedures" of the jail, she provided Prado with "a clean, dry towel following [Prado's] shower." (*Id.*)

Prado then put on her street clothing again. Another officer—possibly Thomas—gave Prado "some documents" to sign. (*Id.* at 546–47.) Those papers referred to Glenda Prado as an "inmate" and explained that she "ha[d] been charged[.]" (*Id.* at 547.) Prado refused to sign the offered papers. (*Id.*) She did not consider herself an inmate and would not sign papers describing her as one. (*Id.*) As a result, an officer ordered Prado into the "hole."[6]

For the most part, Prado sat in the "hole" alone until her husband picked her up. But during that time, officers also led Prado back and forth from the "hole" to a desk three times. On each of those trips, officers asked her to sign the same documents Prado already refused to sign. All three times, Prado refused. On the last trip, an unidentified "little officer [] said [to Fallis] oh, did you check her if she have some tattoos or whatever," while "laughing, ha, ha, ha[.]" (*Id.* at 550.) Fallis told the "little officer" that "[Prado] doesn't have any tattoos." (*Id.*)

On the last trip, Prado also saw a "white male[.]" (R. 25, Am. Compl., PageID 128.) The man's "family was coming for him" and "he was waiting to be picked up[.]" (R. 56, Prado Dep., PageID 551.) Prado "heard" the officers "saying" that the man "was there[] for drugs." (*Id.*) She testified that she could in fact "tell" the white man "was actually high" by "the way he was looking." (*Id.*) So she deduced he "was . . . accused of OVI or drugs" as well. (*Id.* at 550.) Based on her observations of the white man sitting "in the waiting area[,]" Prado concluded that he did not endure the same treatment as she did at the jail. (*Id.* at 552.)

---

[6] Prado later testified that the "hole" was not a jail cell. (R. 56, Prado Dep., PageID 548.) She described it as "a little room where they put you for when -- they put people, a little tiny room with a toilet and a sink and a cement-like bench, very small room." (*Id.*) She also explained that the room locked.

After those three trips between the "hole" and the desk, Fallis retrieved Prado. The officers took Prado's picture and her fingerprints. She also signed some documents.[7] The officers then released Prado to her husband, and she went home.

The next day, Prado retrieved her car from where Thomas had stopped her. That same day, an officer (possibly Defendant Deputy Sheriff Jason Tavner) called Prado and let her know that "somebody" had instructed Thomas to take Prado's urine sample and her license out of the trash. (*Id.* at 555.) Tavner had let Thomas know that "[Thomas] was incorrect to state that [Prado] had refused the urine test and that [Thomas] should retrieve the sample from the trash and submit it and return [Prado's] license." (Appellant's Br. at 15–16.) So the officer on the phone asked Prado to come pick up her license. And she did just that the next day.

The county then charged Prado with OVI in Fairborn Municipal Court. But the lab found Prado had no alcohol and no drugs in her system the night of her arrest. On October 1, 2015, Thomas received the lab's reports and brought them to a supervisor's attention. Prado "became aware" of the lab results six days later. (Appellant's Br. at 18.) Four days after that, the county dismissed all charges against Prado.

Before Prado's arrest for OVI, Prado filed an employment discrimination action against Greene County Department of Child's Services (EEOC claim). She alleged that the county engaged in racial discrimination against her during her employment and in her termination. She named Beth Keller, wife of Defendant Major Kirk Keller (Thomas's boss and head of the Road Patrol), as a primary offender in that action.

Soon after, the parties held the first mediation session for the EEOC claim. Both Defendant County Administrator Brian Huddleson and Beth Rubin, supervisor for Greene County Children's

---

[7] Prado does not recall the contents of those documents she signed. She later guessed they were the same as those she had earlier refused to sign.

Services, attended that session. But Huddleson was unaware of details on the alleged discrimination. So he asked for and received a 60-day continuance to investigate Prado's claims.

In September 2015, the parties again met for the second mediation. Prado contended that Huddleson brought with him a copy of the police report on Prado's arrest to that mediation.[8] She testified that he tried to intimidate Prado with the report. (R. 56, Prado Dep., PageID 573.) Huddleson never provided Prado a copy of the document. But he allegedly tried to show it to the mediator who didn't accept it. (*Id.* (explaining that she "saw [Huddleson] when he tried to hand [the document] to the mediator").) And he offered the document to Prado's attorney who also did not accept it. (*Id.* at 588 (explaining that "[n]obody took" the document).) No one at the mediation (including the mediator) discussed Prado's arrest.

## II.

Prado sued Defendants in federal court. She filed an Amended Complaint that raised four claims. Prado alleged that Defendants violated her equal protection and due process rights, that they conspired to deprive her of her constitutional rights, and that their failure to train and supervise officers led to the alleged violations. She sought damages.

---

[8] During Prado's deposition, she provided conflicting testimony on whether Huddleson did in fact bring and try to offer the police report from her arrest to the mediator. At first, she explained that she did not see the contents of Huddleson's document. (R. 56, Prado Dep., PageID 574.) But she alleged they contained "the sheriff officer seal" so she believed it was "[t]he sheriff report for [her] arrest." (*Id.*) And she later identified Exhibit B, the booking sheet from Prado's arrest, as the document Huddleson tried to provide the mediator. (*Id.* at 588–89.) At oral argument, Defendants' counsel explained their position—that Huddleson did not offer *any* documents to the mediator then. Oral Argument at 24:36, *Prado v. Thomas* (No. 19-3264), http://www.opn.ca6.uscourts.gov/internet/court_audio/aud2.php?link=recent/12-12-2019 - Thursday/19-3264 Prado v Thomas.mp3&name=19-3264 Prado v Thomas.

As part of discovery, Defendants deposed Prado. In the deposition, Prado testified on the five major consequences she suffered because of the arrest, the resulting charges, and her time in jail. First, she explained that the arrest and the resulting events "drain[ed]" her savings. (*Id.* at 561.)

Second, she alleged that both the arrest and the charges hurt her ability to get a job. She testified that she still suffered even after the county dropped all charges against her because "[i]t's out there in my record." (*Id.* at 593.) For example, she testified that she could no longer work as a teacher. She had worked as a teacher before. So she knew that the first things schools or similar employers do is conduct a background check that looks at arrest records. She also testified that she "cannot be a social worker, [] cannot be a clerk, [] can't be anybody." (*Id.*)

To support her testimony, she explained she had applied to positions after the arrest, but no employer hired her. Almost all the applications asked about her arrest history. She left that question blank. She conceded, however, that none of those potential employers attributed their failure to hire Prado to her arrest history or the OVI charge. Eventually, she "just g[a]ve up applying" to any other jobs because she "d[id]n't want to waste [her] time trying to explain [her arrest history and the charges against her] with [sic] people who is [sic] not going to believe me." (*Id.* at 570, 594.) After her arrest, she enrolled in law school. She has focused exclusively on that since her failed attempts to get a job.

Third, Prado attributed her health problems to her arrest and the OVI charges. She alleged that the "stress" she experienced from those events "ma[d]e [her gallbladder condition] worse." (*Id.* at 577–78.) She could not, however, recall if any doctors told her that stress contributed to her condition. She also had high blood pressure. She explained that she had stopped taking medication for her high blood pressure in late 2014. But "[t]hen [she] went to work, [and her]

9

blood pressure went through the roof[.]" (*Id.* at 580.) And she testified that she experienced ovarian cysts in the past before her arrest and the OVI charge. She suffered one after the arrest and attributed it to her stress from interacting with Defendants.

Fourth, Prado alleged that airport security treats her more harshly when she re-enters the country because of her arrest history. To support this allegation, she explained that her arrest history is now "in the computer[.]" (*Id.* at 563.) If a computer user "go[es] into the Greene County stuff and put[s] Glenda Prado it will come up inmate from Greene County. Call the sheriff for information." (*Id.* at 563–64.) Prado had no other arrests—not even a speeding ticket—on her record. Thus, she deduced, her Greene County arrest must explain any different treatment she experienced at airports after the arrest.

Last, Prado alleged she suffered emotional damage. The arrest left Prado feeling "powerless[.]" (*Id.* at 560.) Thomas's actions caused a "big impact . . . [o]n [her] life . . . [.] [It was] very damaging." (*Id.* at 592.) And he "embarrass[ed her.]" (*Id.*) "If [she] was a poor immigrant and [] didn't have a lawyer by now[,]" she testified, she "would be deported[,] . . . los[e] [her] property[,] . . . [and] los[e] [her] daughter's custody[.]" (*Id.* at 592–93.)

Prado did not depose anyone during discovery.[9] Instead, she requested and received interrogatory responses and her arrest footage.[10] The district court also examined Keller's

---

[9] During oral argument, Prado's attorney cited financial difficulty as the reason for Prado's failure to depose anyone during this litigation. Oral Argument at 28:26, *Prado v. Thomas* (No. 19-3264), http://www.opn.ca6.uscourts.gov/internet/court_audio/aud2.php?link=recent/12-12-2019 - Thursday/19-3264 Prado v Thomas.mp3&name=19-3264 Prado v Thomas.

[10] Throughout her deposition, Prado insinuated that Defendants tampered with the video footage. She alleged that events the night of her arrest as she remembered or recounted them and the video footage "do not match." (R. 56, Prado Dep., PageID 587.) She alludes to the allegation in her brief to this court as well. But the district court rejected those insinuations. The court explained that the "IT person" in charge of the Greene County videos said that the county "deactivate[s]" videos regularly on a "retention schedule[.]" (R. 51, Decision Mot. to Compel 2, PageID 483.) The IT person "unequivocally state[d] that" the county already took "the videos related to [her]

unredacted phone records in camera to determine whether he had any contact with the defendants in Prado's employment suit. After reviewing those records, the district court found that Keller "did not speak to any other Defendants or employees of Greene County Children's Services other than his wife, Beth Keller." (R. 53, Order, PageID 492.) And Huddleson provided Prado with "all items discussed in any manner by personnel employed by Greene County" at a Greene County Board of Commissioners meeting that both Huddleson and Keller attended. (R. 51, Decision Mot. to Compel 2, PageID 484 (quoting Prado's "Additional Interrogatories" for Huddleson).)

After discovery, Defendants moved for summary judgment. The district court sustained that motion on qualified immunity grounds for all claims but one. For Prado's due process claim based on Thomas's actions leading Prado from his cruiser to the jail, the court granted summary judgment on other grounds. This appeal followed.

### III.

On appeal, Prado asks this court to reverse the district court's decision to grant Defendants summary judgment. She argues that there are material issues of fact that justify trial on all her claims.

This court reviews de novo the district court's grant of summary judgment. *Marks One Car Rental, Inc. v. Auto Club Grp. Ins. Co.*, 761 F. App'x 516, 521 (6th Cir. 2019) (citing *Luna v. Bell*, 887 F.3d 290, 297 (6th Cir. 2018)). This court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But "dispute[s] as to an immaterial fact do[] not preclude

---

arrest [] 'offline'" (purging them based on the regular retention schedule). (*Id.* at 482.) So the county only had the copy that it already provided Prado during discovery. None of the Defendants had any other copies of Prado's arrest video. And none had any way to obtain another copy. Thus, the district court found that the "IT person's response support[ed]" Defendants' position on the matter. (*Id.* at 483.) It rejected Prado's attempts to compel Defendants to disclose videos other than the one they already provided her.

summary judgment." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* § 2725.1 (4th ed. 2019); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted" for summary judgment purposes.).

The Supreme Court considers a fact material for summary judgment purposes if its existence or nonexistence may affect the litigation's result. *Id.* There is "no precise formula for determining when" there "exist[s] . . . a genuine dispute" of material fact. Wright & Miller, *supra*, § 2725.2. The dispute "is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the nonmoving party who bears the burden during trial fails to present proof "concerning an essential element of the nonmoving party's case[,]" there "can be 'no genuine issue as to any material fact[.]'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c) (1986)). "[A] complete failure of proof" on an essential element of the nonmoving party's case "necessarily renders all other facts immaterial." *Id.* And to determine whether there is a genuine dispute of material facts, this court must "review all facts in a light . . . most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." *Marks One Car Rental*, 761 F. App'x at 521 (internal quotation marks omitted) (quoting *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 613 (6th Cir. 2018), *aff'd*, 139 S. Ct. 2449 (2019)).

**A.**

Prado first alleges that the district court should not have granted Defendants' summary judgment motion on her equal protection claim. She argues that Defendants violated her equal protection rights because they treated her disparately based on her race.

To successfully raise an equal protection claim, a party must show that she received disparate treatment compared to similarly situated individuals. *Ctr. for Bio-ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). To determine "whether individuals are 'similarly situated,' a court should 'not demand exact correlation, but should instead seek relevant similarity.'" *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2011) (quoting *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000)).

Prado has presented no evidence to support her equal protection claim. She mentions two white males in her narrative—one at Circle K and one at the jail. But she has shown no indication that either white male was similarly situated to and received disparate treatment from her. Sure, Thomas did not drive after the Circle K white male, did not stop him, and did not arrest him. But beyond their simultaneous presence in that Circle K, Prado has not alleged facts or presented evidence that show any other similarities between her and that white male. She does not allege, for example, that the white male also drove away with an open trunk, but Thomas did not stop the white male. In fact, we don't even know if that white male drove at any point that night.

Accepting Prado's allegation as true, that officers detained Prado and the white male sitting at the jail reception for the same crime (suspicion of OVI), Prado has not shown that the officers treated that white male differently. She merely alleged that she saw that white male sitting and waiting for someone to pick him up. For all Prado knows, officers could have subjected the white male to the same treatment that she also received—*e.g.*, a pat-down search, a shower, and time in the "hole." In fact, in her affidavit, Fallis swore that she followed the same procedures used for "[*a*]*ll* inmates" to book Prado. (R. 57-2, Summ. J. Mot., Fallis Aff., PageID 718 (emphasis added); *id.* at 717 (explaining the "thorough[] search[es]"); *id.* at 718 (explaining the showers during booking).) And Prado presents no evidence and makes no factual allegation suggesting otherwise.

13

Prado and Fallis do present conflicting testimony on one point—the poopy mop. Even taking Prado's allegation as true (that Fallis gave Prado a poopy mop after the shower), that fact alone does not justify trial on Prado's equal protection claim. Prado does not allege and presents no evidence that Fallis provided similarly situated individuals of a different race—say the white male sitting at reception—anything different.

The "*threshold element* of an equal protection claim is disparate treatment" of similarly situated individuals. *Napolitano*, 648 F.3d at 379 (emphasis added) (quoting *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)). Prado has not met that threshold. Her equal protection claim fails as a matter of law.

**B.**

Second, Prado argues that the district court erroneously granted Defendants summary judgment on her due process claim. She alleges Defendants violated her due process rights at six points: (1) all events before the arrest, (2) the arrest, (3) posting her mugshot, (4) her removal from Thomas's cruiser and into the jail, (5) discarding Prado's urine sample, and (6) the mediation. In her brief to this court, she does not distinguish between procedural or substantive due process. She fails to do so even though Defendants pointed out this shortfall in her lower court materials. (*See* R. 59, Resp. in Opp'n, PageID 766 ("agree[ing] with Defendants[]" that "[d]ue process claims do separate into procedural and substantive components").) Prado only mentions substantive due process once in her briefs to this court. She quotes *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996) and *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 861 (6th Cir. 2012) to describe the concept of substantive due process in her discussion on the mediation. (Appellant's Br. at 33.)

To the best of our ability, we deduce that Prado raises only one substantive due process claim—alleging that the mediation violated her substantive due process rights—but argues that

Defendants violated her procedural due process rights during all six events. *See, e.g.*, *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (addressing only the "substantive component[]" because "Plaintiffs raise only a substantive due process claim on appeal"); *see also United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008) ("declin[ing] to address" an appellant's argument "[t]o the extent that [he] failed to develop or support his argument with any legal authority," and because "[a]n appellant waives an issue when he fails to present it in his initial briefs before this court" (last alteration in original) (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 318 (6th Cir. 2005))).

To successfully allege a procedural due process violation, Prado must make three showings: "(1) [s]he had a life, liberty, or property interest protected by the Due Process Clause; (2) [s]he was deprived of this protected interest; and (3) the state did not afford h[er] adequate procedural rights prior to depriving h[er] of the property interest." *O'Neill v. Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723, 732 (6th Cir. 2011) (quoting *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009)). Procedural due process violations require intentional deprivation or at least reckless government action. *Daniels v. William*, 474 U.S. 327, 328 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347 (1986).

We note that Prado does not present any legal arguments to this court that support her assertion that Thomas's actions leading her from his cruiser to the jail violated her due process rights. On that point, her briefs to this court quibble only with the linguistic differences between the words Prado used in her deposition testimony and those she used in her affidavit to describe Thomas's conduct. (Appellant's Br. at 31–32; Appellant's Reply Br. at 8–9.) Thus, we consider that argument abandoned. *See Castelvetere v. Messer*, 611 F. App'x 250, 255 (6th Cir. 2015) (finding appellant "abandoned th[e] issue" because he "fail[ed] to cite a single authority [to]

support" his "assert[ion]" that the government's conduct violated substantive due process and only alleged that the conduct shocks the conscience). We evaluate the merits of Prado's procedural due process arguments on the other five events.

Prado has failed to allege that Defendants deprived her of "life, liberty, or property." Her procedural due process claims do not warrant trial. Even if Thomas's gaze made Prado uncomfortable at the Circle K, his gaze alone does not violate the Constitution. Thomas also had the "reasonable suspicion" necessary to stop Prado on the road. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). And the officers had probable cause to arrest her.[11] *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause."); *cf. Pyles v. Raisor*, 60 F.3d 1211, 1213, 1215–16 (6th Cir. 1995) (holding that an individual may not seek damages under § 1983 for an arrest supported by probable cause even if the arrest violated state law because the court found "*no* federal constitutional right implicated" (emphasis added)).

As for the public mugshot, we can understand Prado's position. Surely, having a mugshot immortalized on the internet—even if doing so complies with county policy—harms Prado's reputation. And reputational harm *may* contribute to a procedural due process violation. *Paul v. Davis*, 424 U.S. 693 (1976). By itself, however, reputational harm is not a liberty deprivation. *Id.* at 711–12. Nor is it a property deprivation. *Id.* at 711. To amount to a liberty deprivation that

---

[11] Prado tries to undermine the value of the first HGN Thomas administered. She argues that Thomas improperly administered it because she "was still seated in her car with the door closed[.]" (Appellant's Br. at 5, 29.) But the evidence she provided—a policy manual—to support her argument conflicts with her position. The policy manual explains "the subject is instructed to stand with feet together" for the HGN. (R. 59, Ex. 32, NHTSA Manual, PageID 1256.) Right after, however, it explains that the "[s]ubject *may* be placed in *sitting position* to accommodate a better view." (*Id.* (emphasis added).) Even taking Prado's allegations as true, that Thomas administered the first HGN while she sat in her car, Thomas did not improperly administer the test.

requires notice and an opportunity to be heard, "[s]ome alteration of a right or status previously recognized by state law, such as employment" must accompany the reputational harm. *Quinn v. Shirey*, 293 F.3d 315 (6th Cir. 2002) (internal quotation marks omitted) (quoting *Davis*, 424 U.S. at 711–12); *see also Crosby v. Univ. of Ky.*, 863 F.3d 545, 555 (6th Cir. 2017); *Mertik v. Blalock*, 983 F.2d 1353, 1362 (6th Cir. 1993).

But Prado has not alleged facts or put forth evidence that allow this court to find the arrest and OVI charge led to *any* "alteration of a right or status," let alone one recognized by state law. She has not connected her inability to find a job with her arrest. None of the employers that refused to hire Prado attributed their hiring decision to her mugshot or her arrest history. In fact, she refused to disclose her arrest history to any employer who asked. Ultimately *Prado* "g[a]ve up applying" to all jobs. Prado cannot hold Defendants liable for the consequences of her own actions.

Prado has similarly not shown that her public mugshot led to any increased airport screening. She asserts the connection between the two based on two facts: (1) her arrest now appears online and (2) before her Greene County arrest, she has never had a run-in with the police, not even a speeding ticket. But that assertion amounts only to "speculation[] [and] conjecture"— not enough to avoid summary judgment. *Marks One Car Rental*, 761 F. App'x at 521 (quoting *K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018)). And by Prado's own words, any health problems she discussed in her deposition did not stem from her arrest, the OVI charge, or the mugshot. For example, her "blood pressure went through the roof" *when she* "*went to work*." (R. 56, Prado Dep., PageID 580 (emphasis added).)

Thomas did mistakenly throw Prado's urine sample in the trash. But every government mistake does not a procedural due process violation make. The lab found Prado's urine negative for both drugs and alcohol; Thomas's mistake did not deprive Prado of any constitutional rights,

let alone of "life, liberty, or property." And even if Huddleson did try to give the mediator Prado's arrest report, he did only that. The mediator refused Huddleson's offering. After that, nobody mentioned Prado's arrest history. In Prado's own retelling of the facts, Huddleson deprived Prado of nothing.

Last, we analyze Huddleson's actions at the mediation for a substantive due process violation. "Substantive due process is '[t]he doctrine that governmental deprivations of life, liberty[,] or property are subject to limitations regardless of the adequacy of the procedures employed.'" *Range*, 763 F.3d at 588 (first alteration in original) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). It protects a "narrow class" of interests "enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" *Id.* (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003)).

Prado has not named the fundamental right, either enumerated or otherwise found in the Constitution, that requires trial on her substantive due process claim. As far as we can tell, Prado's factual allegations on Huddleson's actions at the mediation do not implicate any right "*so* rooted" in our people's traditions. Huddleson's actions also do not shock the conscience. Substantive due process does not "offer recourse for every wrongful action taken by the government[.]" *Id.* at 589 (internal quotation marks omitted) (quoting *EJS Props.*, 98 F.3d at 862). And "the 'shocks the conscience' standard sets a high bar[.]" *Id.*; *see, e.g.*, *EJS Props.*, 698 F.3d at 862 (holding that "the solicitation of a bribe by a public official" fails to meet this threshold and "does not shock [this court's] collective conscience"). It's hard to imagine why we would now find that Huddleson's alleged *failed attempt* to give Prado's arrest report to the mediator shocks the conscience. Prado's substantive due process claim fails as a matter of law.

## C.

Third, Prado argues the district court improperly granted Defendants summary judgment on her § 1983 civil conspiracy claim. To prevail on a civil conspiracy claim, Prado must show that "'(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive [her] of [her] constitutional rights, and (3) an overt act was committed' in furtherance of the conspiracy that caused the injury." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir.2007)).

Prado has not provided this court with any evidence that shows a genuine dispute of material fact warranting trial on her civil conspiracy claim. No evidence points to any plan. She has similarly failed to show that the so-called conspirators—those involved in her arrest and those involved in her EEOC claim—shared a conspiratorial objective to deprive her of her constitutional rights.

The *only* evidence Prado puts forth to support her civil conspiracy claim and that ties the alleged conspirators together is the marital relationship between Defendant Kirk Keller, Thomas's boss, and Beth Keller, the primary offender in Prado's EEOC claim. Prado does not, however, provide *any* evidence that the two spoke of the two legal actions or conspired against Prado. She has only provided evidence that Defendant Keller and his wife Beth spoke on the phone, an ordinary occurrence between husband and wife. She also provides no evidence to support her speculation that Beth Keller and any of the other Defendants spoke at all, much less about Prado's arrest. And the district court even examined Defendant Keller's phone records in camera and did not find any connection between Keller and others involved in Prado's EEOC action.

**D.**

Last, Prado argues the district court improperly granted Defendants summary judgment on her § 1983 failure to train or supervise claim.  She explains to this court that she does not bring this claim under a municipal theory of liability.  (Appellant's Br. at 37.)  She instead sues Keller as the officer in charge of the jail and road patrol.  She also sues Huddleson as County Administrator.  She points to internal documents that state that "Superior Officers are by General Order, responsible for the actions of their employees and for correcting them" to support her claim.  (*Id.* (emphasis omitted) (citing R. 59, Ex. 34, Greene County Sheriff's Office General Order, PageID 957).)

She also asserts that she does not bring this claim under a respondeat superior theory to avoid the prohibition against using vicarious liability theory to hold government officials liable under § 1983.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (agreeing that "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*" and that "vicarious liability is inapplicable to *Bivens* and § 1983 suits").  But asserting something does not make it so.  Her failure to train or supervise claims sound only in respondeat superior theory.  Prado asks this court to impose liability on Keller and Huddleson for actions taken by the other Defendants; she does not raise any facts or put forth any evidence that tend to show that Keller or Huddleson "through [*their*] *own individual actions*" committed violations.  *Id.* (emphasis added).  These claims against Keller and Huddleson fail as a matter of law.

**IV.**

Because Prado's factual allegations create no material dispute of facts justifying trial, we need not consider her qualified immunity arguments. Thus, we AFFIRM the district court's decision to grant Defendants summary judgment on all claims.